Dorothy P. **ROBINSON** et al., Appellees,

v.

**LORILLARD CORPORATION** et al.
(two cases), Appellants.

Nos. 15098, 15099.

United States Court of Appeals,
Fourth Circuit.

Argued Feb. 11, 1971.

Decided July 1, 1971.

Sammie Chess, Jr., High Point, N. C., J. LaVonne Chambers, Adam Stein and Robert Belton, Charlotte, N. C., and William Bennett Turner, San Francisco, Cal., on brief for the appellees and cross-appellants.

C. Allen Foster and Thornton H. Brooks, Greensboro, N. C., on brief for appellants and cross-appelees.

James F. Carroll, New York City, Robert G. Sanders and Larry Thomas Black, Charlotte, N. C., on brief for the Union as appellant and cross-appellee.

Stanley P. Hebert, Gen. Counsel, and Julia P. Cooper, Chief, Appellate Section, Equal Employment Opportunity Commission, on brief, and David W. Zugschwerdt, Atty., Equal Employment Opportunity Commission, for amicus curiae.

Before SOBELOFF, Senior Circuit Judge, and BRYAN and BUTZNER, Circuit Judges.

SOBELOFF, Senior Circuit Judge:

This is a class action arising under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Plaintiffs are representative members of the class comprised of those Negro employees hired prior to May 31, 1962, into the blending, cutting, service, and shipping and receiving departments of the Lorillard Corporation plant in Greensboro, North Carolina. The Lorillard Corporation is named as defendant, as are the Tobacco Workers International Union and its Local No. 317, the bargaining representatives for the employees of the Greensboro plant. At issue is the validity, as applied to the above class, of the departmental seniority system provided by the collective bargaining agreement for the plant.

From 1956, when Lorillard's Greensboro plant began operation, until May 31, 1962, Lorillard practiced overt racial discrimination in hiring. Five departments were all-white; Negroes were hired only into blending, cutting, service, and shipping and receiving—the four departments containing the lowest paying, least desirable jobs in the plant. The first collective bargaining agreement, negotiated in 1957, adopted a departmental and job seniority system which determined all important employment rights on the basis of length of service within a department and within a job classification in the department. Transfers between departments were explicitly prohibited.[1]

This departmental seniority system remained in effect unaltered until 1962 when it was amended to allow interdepartmental transfers to employees willing to forfeit accumulated seniority and begin as new employees in the department to which they were transferring. The 1962 agreement also abolished job seniority, providing instead for job openings to be filled by the most senior interested employee within the department, regardless of what specific jobs he had previously held.

In 1965, the provisions governing transfer between departments were further modified to allow a transferring employee, laid off because of low seniority in his new department, to return to his old department and maintain his original departmental seniority there. Otherwise, the 1962 transfer restrictions were retained—allowing transfers only when openings were available and only to the lowest paying, entry level jobs. The new collective bargaining agreement negotiated in 1968 made no further changes in the seniority and transfer provisions.

The District Court found the departmental seniority system in violation of the law because it poses a continuing

---

1. The original collective bargaining agreement also provided for certain jobs to be held only by the members of one sex or the other. These restrictions were subsequently dropped and are not at issue here.

discriminatory barrier to those Negroes who began work at the plant subject to Lorillard's discriminatory hiring policy prior to May 31, 1962. Therefore, the court ordered (1) modification of the transfer restrictions to permit employees to transfer to a different department to fill vacancies which may occur and, after a residency period of thirty days in the new department, to exercise their full employment seniority for all purposes, (2) adoption of "red circling" to allow a transferring employee to continue his old wage rate in effect until rising in his new department to a position paying an equal or greater wage rate, and (3) payment of back pay to members of the affected class. The District Court declined to award counsel fees as costs to the plaintiffs.

The defendants appeal the finding of discrimination and the award of damages. Plaintiffs appeal the denial of counsel fees. We affirm the judgment of the District Court with regard to those issues raised by the defendants, reverse the portion of the judgment denying counsel fees, and remand for assessment of damages and costs.

I. *The Existence of Unlawful Racial Discrimination.*

 The Civil Rights Act of 1964 does not prohibit or provide a remedy for acts of discrimination which occurred prior to July 2, 1965. Thus, Lorillard's present hiring policies are not at issue here because there is no evidence of record to establish the existence of a discriminatory hiring policy any later

than the spring of 1962. However, "[w]hile it is true that the Act was intended to have prospective application only, relief may be granted to remedy present and continuing effects of past discrimination." Griggs v. Duke Power Co., 420 F.2d 1225, 1230 (4th Cir. 1970).[2] The seminal opinion on this subject is Quarles v. Philip Morris, Inc., 279 F.Supp. 505 (E.D.Va.1968). In that case Judge Butzner of our court, sitting as a district judge by designation, considered carefully the arguments to the contrary and concluded:

> The plain language of the act condemns as an unfair practice all racial discrimination affecting employment without excluding present discrimination that originated in seniority systems devised before the effective date of the act.
>
> \* \* \* \* \* \*
>
> \* \* \* The history leads the court to conclude that Congress did not intend to require "reverse discrimination"; that is, the act does not require that Negroes be preferred over white employees who possess employment seniority. It is also apparent that Congress did not intend to freeze an entire generation of Negro employees into discriminatory patterns that existed before the act.

279 F.Supp. at 515–516.

 The record amply supports the findings of the District Court that Lorillard's departmental seniority system has a continuing discriminatory impact on the class represented by the plain-

2. The *Griggs* case was partially reversed by the Supreme Court. Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). However, the portion of the Fourth Circuit's opinion quoted in the text was not at issue on appeal. *See also* Parham v. Southwestern Bell Telephone Co., 433 F.2d 421, 427 (8th Cir. 1970) ; Jones v. Lee Way Motor Freight, Inc., 431 F.2d 245, 248–249 (10th Cir. 1970), cert. denied, 401 U.S. 954, 91 S.Ct. 972, 28 L.Ed.2d 237 (1971) ; United States v. Dillon Supply Co., 429 F.2d 800, 803–804 (4th Cir. 1970) ; United States v. IBEW, Local No. 38, 428

F.2d 144, 149–151 (6th Cir.), cert. denied, 400 U.S. 943, 91 S.Ct. 245, 27 L.Ed.2d 248 (1970) ; Local 189, United Papermakers and Paperworkers, AFL–CIO, CLC v. United States, 416 F.2d 980, 991–994 (5th Cir. 1969), cert. denied, 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed.2d 108 (1970) ; United States v. Sheet Metal Workers Int'l Assoc., Local Union No. 36, 416 F.2d 123, 131–132 (8th Cir. 1969) ; Local 53, International Association of Heat and Frost Insulators and Asbestos Workers v. Vogler, 407 F.2d 1047, 1054–1055 (5th Cir. 1969).

tiffs. First, because the "white" departments are the better paying ones, the whites hired into those departments under the discriminatory hiring policy are presently receiving higher rates of pay than Negroes hired at the same time into the other four departments. Furthermore, if all barriers to transfer were removed, under a departmental seniority system the plaintiffs will always suffer a real economic handicap in the better paying departments. As transferees they are treated as new hires for departmental seniority purposes, while white coworkers hired at the same time have departmental seniority coextensive with their total employment seniority.

Nor have all barriers to transfer been removed. Since transferees are treated as new hires in the departments to which they are transferring, they start in entry level jobs at entry level pay rates. Thus, while a new department may offer a better long-range future, the immediate effect of transferring is acceptance of a substantial reduction in rate of pay, possibly for an extended period.

The defendants raise several arguments to counter the reasoning of *Quarles* and the numerous cases that have followed *Quarles*. Chief among them is the assertion that Lorillard's departmental seniority system is dictated by business necessity and intended to serve a legitimate business purpose. The terms "business necessity" and "business purpose"—used interchangeably in the briefs—do not represent identical concepts; nor are they equally relevant in assessing the validity of an employment practice. The distinction between them is best explained and understood by examining, first, the Title VII intent requirement, and second, the

range of practices prohibited as unlawfully discriminatory under Title VII.

A. *Intent.*

 Employment discrimination suits initiated by private individuals are governed by § 706 which provides in § 706(g) for equitable relief if the court finds that a defendant "has intentionally engaged in or is intentionally engaging in" an unlawful employment practice.[3] Although defendants in Title VII cases have sought to establish that this portion of the statute requires that plaintiffs prove the existence of a discriminatory intent, the correct interpretation is that which Judge Wisdom gives in Local 189, United Papermakers and Paperworkers, AFL–CIO, CLC v. United States, 416 F.2d at 996:

> [T]he statute, read literally, requires only that the defendant meant to do what he did, that is, his employment practice was not accidental. The relevant legislative history * * * bears out the language of the statute on that point.[4]

The Supreme Court has conclusively adopted this interpretation in Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971):

> Under the Act, practices, procedures, or tests neutral on their face, and even neutral in terms of intent, cannot be maintained if they operate to "freeze" the status quo of prior discriminatory employment practices.
>
> \* \* \* \* \* \*
>
> \* \* \* Congress directed the thrust of the Act to the *consequences* of employment practices, not simply the motivation.

401 U.S. 424, 91 S.Ct. at 853 (Emphasis in original). Thus the presence in a respondent's mind of a "business purpose"

---

3. 42 U.S.C. § 2000e–5(g). Suits may also be instituted by the Attorney General under § 707, 42 U.S.C. § 2000e–6.

4. The legislative history relevant to § 706 (g) is thoroughly reviewed in Comment, Title VII of the Civil Rights Act of 1964 and Minority Group Entry into the Building Trade Unions, 37 U.Chi.L.Rev. 328, 334–35 (1970); Note, Legal Implications of the Use of Standardized Ability Tests in Employment and Education, 68 Colum.L.Rev. 691, 713 (1968).

rather than a discriminatory motive for maintaining a challenged employment practice is not alone determinative of the validity of the practice.

█ This is not to say that actual intent or motive is irrelevant to determining whether rights assured by Title VII have been infringed. In some instances the reasons for taking particular action may determine whether the action is unlawfully discriminatory. However, if a respondent's actions are otherwise determined to constitute an unlawful employment practice, the existence of a business purpose for continuing the practice will not negate its illegality. The Supreme Court's opinion in *Griggs v. Duke Power Co.* leaves no doubt on this point:

> The Court of Appeals held that the Company had adopted the diploma and test requirements without any "intention to discriminate against Negro employees." We do not suggest that either the District Court or the Court of Appeals erred in examining the employer's intent; but good intent or absence of discriminatory intent does not redeem employment procedures or testing mechanisms that operate as "built-in headwinds" for minority groups and are unrelated to measuring job capability.

401 U.S. 424, 91 S.Ct. at 854.

B. *Unlawful Employment Practices.*

█ It is in determining whether a practice is unlawfully discriminatory that the business necessity test does come into play. The courts have recognized that repondents are sometimes justified in continuing an employment practice regardless of its differential racial impact. The classic example of an acceptable practice is an employer's policy, in filling secretarial positions, of hiring only applicants who can type even though, especially in a limited geographical area, it may be much more difficult for Negroes than for whites to obtain the necessary training and experience.

The business necessity test has evolved as the appropriate reagent for detecting which employment practices are acceptable and which are invalid because based on factors that are the functional equivalent of race. For example, Local 189, United Papermakers & Paperworkers, AFL–CIO, CLC v. United States, *supra,* was concerned with the validity of a seniority system which, as in our case, was itself neutral but perpetuated the effects of previous racial discrimination in hiring. The Fifth Circuit formulated this expression of the governing test:

> The controllng [sic] difference between the hypothetical typing requirement and the nepotism rule rejected in *Vogler* is *business necessity.* When an employer or union has discriminated in the past and when its present policies renew or exaggerate discriminatory effects, those policies must yield, unless there is an overriding legitimate, non-racial business purpose.

416 F.2d at 989 (Emphasis in original). The Tenth Circuit has framed the test a little differently in Jones v. Lee Way Motor Freight, 431 F.2d 245 (1970), which also involved a neutral transfer policy which perpetuated the effects of prior racial hiring practices: "When a policy is demonstrated to have discriminatory effects, it can be justified only by a showing that it is necessary to the safe and efficient operation of the business." 431 F.2d at 249.

Griggs v. Duke Power Co., *supra,* presented a slightly more complicated factual situation. At issue was Duke Power Company's policy of restricting hiring and transfers into certain departments to persons failing either to meet certain educational requirements or to pass standardized tests. Two distinguishable groups of employees were affected by the policy. The first consisted of Negro employees who had been hired prior to adoption of the educational and testing requirements, but during a period when the company hired Negroes only into the Labor Department. The Court of Appeals held the educational and testing requirements invalid as applied to this group, because white employees hired during the same period

had gained access to the more desirable departments without being required to meet the educational standard.

The second affected group consisted of those Negroes who could not meet the educational requirements and had been hired into the Labor Department after the educational standard had been erected. The plaintiffs argued that, because centuries of cultural and educational discrimination had placed Negroes at an educational disadvantage and because the restrictive requirements were not specifically job-related, the educational standards should be overturned as applied to the second group as well as the first. The majority of the Court of Appeals rejected this line of argument on its finding that there existed a genuine business purpose for the policy. 420 F. 2d 1225 at 1231–1235. The Supreme Court reversed that portion of the decision upholding the educational requirement. In a unanimous opinion, the Court held the business necessity test to control, and found Duke Power's policy incapable of meeting that standard:

> The Act proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation. The touchstone is business necessity. If an employment practice which operated to exclude Negroes cannot be shown to be related to job performance, the practice is prohibited.
>
> 401 U.S. 424, 91 S.Ct. at 853.

■■ Collectively these cases conclusively establish that the applicable test is not merely whether there exists a business purpose for adhering to a challenged practice. The test is whether there exists an overriding legitimate business purpose such that the practice is necessary to the safe and efficient operation of the business. Thus, the business purpose must be sufficiently compelling to override any racial impact;[5] the challenged practice must effectively carry out the business purpose it is alleged to serve;[6] and there must be available no acceptable alternative policies or practices which would better accomplish the business purpose advanced, or accomplish it equally well with a lesser differential racial impact.[7]

■ Lorillard advances three "cogent business interests" for maintaining its departmental seniority system. The first is captioned "Industry Practice and Previous Experience." The substance of this point is that the Greensboro plant was the successor to an earlier Jersey City plant, and the practices at the old site were simply transplanted into the new operation. Lorillard further asserts that its seniority system is similar to those in other collective bargaining

---

5. The desire of a union to insure family security by restricting new membership to the sons and close relatives of present members may constitute a legitimate "business purpose." But it cannot override the racial impact where present union membership is all-white. *See* Local 53, International Association of Heat & Frost Insulators and Asbestos Workers v. Vogler, 407 F.2d 1047 (5th Cir. 1969).

6. In the *Griggs* case the Supreme Court held that "Congress has placed on the employer the burden of showing that any given requirement must have a *manifest* relationship to the employment in question." 401 U.S. 424, 91 S.Ct. at 854. The Court concluded that Duke Power failed to carry that burden in arguing that its educational standards were necessary to upgrade the quality of the work force:

> On the record before us, neither the high school completion requirement nor the general intelligence test is shown to bear a demonstrable relationship to successful performance of the jobs for which it was used.
>
> 401 U.S. 424, 91 S.Ct. at 853.

7. It should go without saying that a practice is hardly "necessary" if an alternative practice better effectuates the intended purpose or is equally effective but less discriminatory. Thus, with regard to testing, the Equal Employment Opportunity Commission guidelines stipulate that

> where technically feasible, a test should be validated for each minority group with which it is used; that is, any differential rejection rates that may exist, based on a test, must be relevant to performance on the jobs in question.
>
> 29 C.F.R. § 1607.4(a).

agreements in the tobacco industry. These submissions might have some force were it necessary to establish a bad motive or discriminatory intent as one element in a Title VII suit. But neither maintenance of the status quo nor conformance to precedent is a legitimate business purpose that will vindicate an otherwise unlawful practice.

Lorillard's second argument is that the seniority system was only adopted under union pressure, and that, "A company would probably never establish a seniority system of its own accord * * *." At first blush this appears to be a rather forceful statement that the seniority system serves no business purpose. But Lorillard's apparent point is that it was forced either to accept the system or endure a strike.

▮▮▮▮ Avoidance of union pressure also fails to constitute a legitimate business purpose which can override the adverse racial impact of an otherwise unlawful employment practice. The rights assured by Title VII are not rights which can be bargained away—either by a union, by an employer, or by both acting in concert. Title VII requires that both union and employer represent and protect the best interests of minority employees. Despite the fact that a strike over a contract provision may impose economic costs,[8] if a discriminatory contract provision is acceded to the bargainee as well as the bargainor will be held liable.

▮▮▮ Lorillard's third argument, entitled "Efficiency, Economy and Morale," comes closest to stating a legitimate business purpose. The most forceful point under this heading is the assertion that employees will perform a job more efficiently if they have prior experience at other jobs within the same department. However, this "efficiency" business purpose fails to withstand scrutiny for a number of reasons. First, the record is barren of any real evidence that the jobs in the formerly all-white departments are so complex and interrelated that progression through a series of jobs is necessary to efficient performance of the more difficult tasks.

Second, there is direct evidence to the contrary in the fact that the seniority system ordered into effect by the District Court had been originally proposed *by Lorillard* in the course of negotiating the 1968 collective bargaining agreement. The District Court added only the red-circling requirement to remove the wage rate barrier to transfers. Third, Lorillard's efficiency argument is clearly inconsistent with its earlier argument that the seniority system would never have been adopted if the union had not forced it upon the company. Fourth, the order of the District Court specifically provides for a preliminary trial period on the job. If the transferee is unable to perform satisfactorily, the transfer does not become final and the employee returns to his old job.

Finally, it is difficult to imagine how even the necessity for job progression could constitute the business necessity which would justify a departmental seniority system that perpetuated the effects of prior discriminatory practices. For, after all, seniority is necessarily an inefficient means of assuring sufficient prior job experience. It may take only six months to learn a job well and become qualified for advancement. Yet the vagaries of chance may present an opportunity for advancement in only six weeks or not for six years. When some employees have been discriminatorily de-

---

8. While considerations of economy and efficiency will often be relevant to determining the existence of business necessity, dollar cost alone is not determinative. For example, although there undoubtedly are significant costs involved in validating tests, *Griggs* requires that employment tests be abandoned if not specifically validated as job-related. Analogous is Diaz v. Pan American World Airways, 442 F. 2d 385 (5th Cir. 1971), where the court explicitly held that mere customer preference would not justify continuation of a discriminatory hiring policy, even in the context of a sex discrimination case which, unlike race cases, is subject to a "bona fide occupational qualification" exception. At 386.

nied entry to the department, an alternative promotion system could advance the employee who has been discriminated against if he has the greatest employment seniority and has served a necessary minimum time in his present job or has satisfactorily established his capacity to handle the job. Such an alternative plan would accomplish the business purpose "equally well with a lesser differential racial impact." [9]

We recognize Lorillard's point that changing the seniority system may frustrate the expectations of employees who have established departmental seniority but not employment seniority in the preferable departments. However, Title VII guarantees that all employees are entitled to the *same* expectations regardless of "race, color, religion, sex, or national origin." [10] Where some employees now have lower expectations than their coworkers because of the influence of one of these forbidden factors, they are entitled to have their expectations raised even if the expectations of others must be lowered in order to achieve the statutorily mandated equality of opportunity.

We also recognize that some additional administrative costs may be imposed by the order of the District Court. But we have already noted that avoidance of the expense of changing employment practices is not a business purpose that will validate the racially differential effects of an otherwise unlawful employment practice. *See* note 8, *supra*.[10a]

## II. *Effect of EEOC Decision.*

When the original charges filed in this case were considered by the Equal Employment Opportunity Commission (EEOC), the Commission concluded in a decision filed on July 27, 1966, that there was no reasonable cause to believe that the Act had been violated. Lorillard now advances that decision as negating liability on the part of the company and the union.

The Courts of Appeals which have considered the issue have held that court actions under Title VII are de novo proceedings and that a Commission "no reasonable cause" finding does not bar a lawsuit in the case. Thus, the Fifth Circuit has held in Beverly v. Lone Star Lead Const. Corp., 437 F.2d 1136, 1141 (1971):

> [T]he courts afford the only effective remedy under the present state of the law. Lawsuits and disputes are for the courts. We will not permit the single finding of this investigatory agency to stand as a complete defense which precludes all hope of adversary adjudication or remedial action in the courts.[11]

However, Lorillard's argument is a subtler one. Section 713(b) of the Act provides that:

> In any action or proceeding based on any alleged unlawful employment practice, no person shall be subject to any liability or punishment for or on account of (1) the commission by such person of an unlawful employment practice if he pleads and proves that the act or omission complained of was in good faith, in conformity with, and in reliance on any written interpretation or opinion of the Commission * * *.[12]

Since Lorillard and the union renegotiated the collective bargaining agree-

9. Text at note 7, *supra*.

10. 42 U.S.C. § 2000e–2.

10a. Subsequent to the preparation of this opinion, the Second Circuit has filed its decision in United States v. Bethlehem Steel Corp., 446 F.2d 652 (2d Cir. June 21, 1971). Judge Feinberg's opinion touches on many points discussed in part I of this opinion and is fully in accord with our resolution of the case.

11. *Accord,* Flowers v. Local No. 6, Laborers Int'l Union of North America, 431 F.2d 205 (7th Cir. 1970); Fekete v. U. S. Steel Corp., 424 F.2d 331 (3d Cir. 1970). Judge Zirpoli's opinion in Grimm v. Westinghouse Electric Corp., 300 F. Supp. 984 (N.D.Calif.1969), also merits close reading.

12. 42 U.S.C. § 2000e–12(b).

ment in 1968, they suggest that the departmental seniority system was retained in reliance on the 1966 EEOC decision.

 Under the Commission's regulations EEOC reasonable cause determinations are not interpretations which may be relied upon to establish the § 713(b) immunity:

> Only (a) a letter entitled "opinion letter" and signed by the General Counsel on behalf of the Commission or (b) matter published and so designated in the Federal Register may be considered a "written interpretation or opinion of the Commission" within the meaning of section 713 of Title VII.

29 C.F.R. § 1601.30. This regulation has been upheld as a reasonable interpretation of the statute in Local 189, United Papermakers & Paperworkers, AFL–CIO, CLC v. United States, *supra* 416 F.2d at 997. And the Supreme Court has specifically held that EEOC interpretations are entitled to the "great deference" normally accorded interpretations of the agency charged with administering a statute. Griggs v. Duke Power Co., 401 U.S. at 433–435, 91 S.Ct. at 854–856.

Moreover, the EEOC interpretation of § 713(b) is an eminently reasonable one. It simply insures that the only Commission interpretations and opinions which will be given binding effect under that section are those based either upon a solid factual foundation or upon the most thorough consideration of the potential factual situations to which the rule might apply. For, as Judge Gewin notes in Beverly v. Lone Star Lead Const. Co., *supra* 437 F.2d at 1141,

> [t]he Commission is neither required nor physically able to conduct an "in depth" investigation in every case; apparently the investigative procedure, in the instant case was performed on an ex parte basis, bereft of all of the advantages which come from an adversary proceeding in a court of law.

Thus, the regulation gives conclusive effect only to General Counsel opinion letters based on stated factual assumptions, and official interpretive regulations which have received the Commission's most careful consideration.

We hold that a "no reasonable cause" determination is not a "written interpretation or opinion of the Commission" within the meaning of § 713(b).

### III. *The Back Pay Award.*

The award of back pay to the affected class is challenged on three grounds. Defendants urge that only injunctive and not monetary relief may be ordered in a class action. They argue further that the plaintiffs have specifically waived and disclaimed any right to recover back pay for the class. And alternatively they would have the back pay award vacated as an abuse of discretion on the facts of this case. We agree with none of these contentions, though each in turn merits some discussion.

### A. *Monetary Relief in a Class Action.*

 The District Court held that "[t]his action is properly maintained as a class action under Rule 23(b) (2) of the Federal Rules of Civil Procedure." Robinson v. Lorillard Corp., 319 F.Supp 835, 842 (M.D.N.C.1970). Rule 23(b) (2) reads as follows:

> (b) *Class Action Maintainable.* An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> (2) The party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole \* \* \*.

It is defendants' position that Rule 23(b) (2), by its pointed reference to "injunctive relief or corresponding declaratory relief," does not contemplate specific monetary relief. They cite in

support 3B Moore's Federal Practice ¶23.40, at 23–654 (2d ed. 1969). At the cited page the following quotation appears, "But (b) (2) was not intended to apply where the appropriate final relief relates *exclusively or predominantly* to money damages." (Emphasis added.) In nearly identical language the Advisory Committee's Note states, "The subdivision does not extend to cases in which the appropriate final relief relates *exclusively or predominantly* to money damages." 39 F.R.D. 69, 102 (1966) (emphasis added). There is nothing in Moore, in the Advisory Committee's Note, or in any case cited to us which supports the proposition that no monetary relief may be ordered in a class action under Rule 23(b) (2).

The relief provision in Title VII empowers the court to "enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include reinstatement or hiring of employees, with or without back pay * * *."[13] ⌐The back pay award is not punitive in nature, but equitable—intended to restore the recipients to their rightful economic status absent the effects of the unlawful discrimination.⌐ It is for precisely this reason that the Fifth Circuit has held it unnecessary to impanel a jury to assess back pay:

> The demand for back pay is not in the nature of a claim for damages, but rather is an integral part of the statutory equitable remedy, to be determined through the exercise of the court's discretion, and not by a jury.

Johnson v. Georgia Highway Express, Inc., 417 F.2d 1122, 1125 (5th Cir. 1969).

This is a case in which final injunctive relief is appropriate and the defendants' liability for back pay is rooted in grounds applicable to all members of the defined class.[14] Under these circumstances the award of back pay, as one element of the equitable remedy, conflicts in no way with the limitations of Rule 23(b) (2). The Seventh Circuit's opinion in Bowe v. Colgate-Palmolive Co., 416 F.2d 711 (7th Cir. 1969), is in full accord with our holding, and we adopt their reasoning to the following effect:

> We are also unable to perceive any justification for treating such a suit as a class action for injunctive purposes, but not treat it so for purposes of other relief. The clear purpose of Title VII is to bring an end to the proscribed discriminatory practices and to make whole, in a pecuniary fashion, those who have suffered by it. To permit only injunctive relief in the class action would frustrate the implementation of the strong Congressional purpose expressed in the Civil Rights Act of 1964.

*Id.* at 720.[15]

B. *Waiver of Back Pay Claim.*

The complaint filed by the plaintiffs in the District Court did not specifically request an award of back pay, though it did request "such other additional relief as may appear to the Court to be equitable and just." At a pretrial hearing concerning the appro-

---

13. 42 U.S.C. § 2000e–5(g).

14. Defendants also urge that back pay should not have been granted the class because individual circumstances vary and not all members are actually entitled to recover. However, the District Court's holding does not assure a monetary recovery to all class members, but provides for a separate determination of who is entitled to recover and how much. The fact remains that all members of the class have been subject to the unlawful practice. Therefore, those who have suffered loss of pay because of the practice are entitled to appropriate compensation.

15. See also the thorough consideration of this issue in Local 186, Int'l Pulp, Sulphite, and Paper Mill Workers v. Minnesota Mining & Mfg. Co., 304 F.Supp. 1284 (N.D.Ind.1969).

priateness of a class action, one of the lawyers for the plaintiffs clearly indicated that the suit was one for injunctive relief rather than recovery of lost wages. It was not until well after trial of the case, though before the judge had entered a decision, that a request was made for additional relief in the form of back pay for the class. Defendants argue that these facts constitute an effective renunciation and waiver of any right to receive an award of back pay.

The starting point for resolution of this issue is Rule 54(c) of the Federal Rules of Civil Procedure which provides:

> Except as to a party against whom a judgment is entered by default, every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, *even if the party has not demanded such relief in his pleadings.* (Emphasis added.)

This provision has been liberally construed, leaving no question that it is the court's duty to grant whatever relief is appropriate in the case on the basis of the facts proved.[16] The pleadings serve only as a rough guide to the nature of the case.

There are only two limiting principles to the general rule which might avail the defendants. The first is that a remedy desired by *none* of the parties should not be forced upon them. Mercury Oil Refining Co. v. Oil Workers Int'l Union, 187 F.2d 980, 983 (10th Cir. 1951); International Nikoh Corp. v. H. K. Porter Co., 358 F.2d 284, 290 (7th Cir. 1966) (dictum). But that is not our case. Although the plaintiffs initially indicated that they were not seeking back pay, prior to the entry of judgment they added a request that back pay be awarded the class. Clearly it was not forced upon them against their will.

The one other limiting principle which might assist defendants' case is expressed in the following manner by Rental Development Corporation of America v. Lavery, 304 F.2d 839, 842 (9th Cir. 1962):

> If, however, it is made to appear that the failure to ask for particular relief substantially prejudiced the opposing party, Rule 54(c) does not sanction the granting of relief not prayed for in the pleadings.

In our case, because the obligation to provide back pay stems from the same source as the obligation to reform the seniority system, any general defenses relevant to the back pay award were equally relevant to the suit for injunctive relief. Any specific defenses related only to computation of back pay may be raised during the process of assessing individual back pay claims, possibly before a special master.[17] The defendants have in no way been prejudiced by the belated claim.

### C. *Appropriateness of Back Pay Award.*

As a final protest, defendants argue that the award of back pay represents an abuse of discretion on the part of the District Court. As has been noted in Bowe v. Colgate-Palmolive Co., *supra* 416 F.2d at 721, however, the Title VII grant of remedial authority "should be broadly read and applied so as to effectively terminate the practice and make its victims whole."

Defendants argue that even if the EEOC "no reasonable cause" finding is not a complete bar to the action, the District Court should have taken it into account in determining whether to award back pay. We have already discussed in part II of this opinion the fact that Title VII suits are de novo proceedings which are not influenced by the EEOC decision in the case. Quite properly the District Court ignored the "no reasonable cause" finding.

---

16. *See generally* 6 Moore's Federal Practice ¶ 54.62 (2d ed. 1966) ; 3 Barron & Holtzoff, Federal Practice and Procedure § 1194 (Rev.ed. 1958).

17. The District Court has deferred computation of back pay for individual class members. *See* 319 F.Supp. at 843.

804

■ Next it is argued that back pay should not be awarded in the absence of a specific intent to discriminate. A corollary argument is that the award was improper in light of the unsettled state of the law. The principal answer to both points is that back pay is not a penalty imposed as a sanction for moral turpitude; it is compensation for the tangible economic loss resulting from an unlawful employment practice. Under Title VII the plaintiff class is entitled to compensation for that loss, however benevolent the motives for its imposition.

■ Nor, as defendants contend, are damages so speculative here as to be punitive. Presumably the awards will be based on fixed wage rates and ascertainable periods of work. Any specific challenge to the method of determining back pay may be raised on appeal after the District Court has assessed the amounts to be paid.

### IV. *Attorneys' Fees.*

Plaintiffs' sole appeal is from the District Court's denial of counsel fees:

> While more meritorious defenses have in some cases been presented, the defenses here cannot be fairly characterized as extreme. Therefore, the Court declines to award counsel fees as part of the costs for the plaintiffs.

319 F.Supp. at 843.

■ Our decision in Lea v. Cone Mills, 438 F.2d 86 (4th Cir. 1971), decided after the District Court had rendered judgment in this case, establishes that the denial of counsel fees was an abuse of discretion. In Lea v. Cone Mills we noted that under Title VII, as under Title II of the Civil Rights Act of 1964, attorneys' fees are to be imposed not only to penalize defendants for pursuing frivolous arguments, but to encourage individuals to vindicate the strongly expressed congressional policy against racial discrimination. The appropriate standard, therefore, is that expressed by the Supreme Court in Newman v. Piggie Park Enterprises, 390 U.S. 400, 402, 88 S.Ct. 964, 966, 19 L.Ed.2d

1263 (1968): "It follows that one who succeeds in obtaining an injunction under that Title should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust."

Affirmed in part; reversed in part; and remanded for further proceedings consistent with this opinion.