EQUAL EMPLOYMENT
OPPORTUNITY
COMMISSION

v.

GREYHOUND LINES, INC.

Civ. A. No. 78–2855.

United States District Court,
E. D. Pennsylvania.

Oct. 29, 1979.

Frank J. Tuk, David Ingram, Ruth B. Segal, Equal Employment Opportunity Commission, Philadelphia, Pa., for plaintiff.

Barry Simon, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

NEWCOMER, District Judge.

### DISCUSSION

This action is brought by the plaintiff to redress an alleged violation of Sections 706(f)(1) and (3) and 706(g) of Title VII of the Civil Rights Act of 1964, as amended Title 42 U.S.C. § 2000e *et seq.* Plaintiff seeks injunctive and other appropriate relief, including an award of back pay. Jurisdiction of this Court is based on 28 U.S.C. § 1345.

The plaintiff, the Equal Employment Opportunity Commission, has brought this action on behalf of Mr. Jeffrey Ferguson, a black male. Mr. Ferguson was formerly an employee of defendant Greyhound Lines (hereinafter Greyhound). He was discharged because of his failure to comply with Greyhound's "no beard" policy.

### FACTS

1. Greyhound is a corporation organized under the laws of the State of California and is doing business in the Commonwealth of Pennsylvania. It is in the business of providing inter-city bus transportation as a common carrier, and has a terminal located at 17th and Market Streets in the City of Philadelphia.

2. This Civil Action has been brought pursuant to Section 706(f)(1) and (3) and 706(g) of Title VII of the Civil Rights Act of 1964, as amended, Title 42 U.S.C. Section 2000e *et seq.* (1976 ed.), hereinafter referred to as Title VII.

3. Greyhound Lines, Inc. is an employer within the meaning of Section 701(b) of Title VII of the Civil Rights Act of 1964, as amended, Title 42 U.S.C. § 2000e–(b).

4. Since at least July 2, 1965, Defendant Greyhound has continuously been and is now an employer engaged in an industry

affecting commerce within the meaning of Section 701(b), (g) and (h) of Title VII, 42 U.S.C. Section 2000e(b), (g) and (h).

5. Since at least July 2, 1965, Greyhound Lines, Inc. has continuously and does now employ twenty-five (25) or more employees for each working day in each of twenty or more calendar weeks within the meaning of Section 701(b), of Title VII, Title 42, U.S.C. § 2000e(b).

6. More than thirty (30) days prior to the institution of this lawsuit, Jeffrey B. Ferguson filed a charge with the Equal Employment Opportunity Commission alleging a violation of Title VII by Defendant Greyhound.

7. Jeffrey B. Ferguson is a 27 year old black male. He was discharged from Greyhound because of his inability to comply with the company's "no beard" policy. Greyhound's grooming policy requires that all male employees who have contact with the public must be clean shaven.

8. Greyhound's supervisors are not permitted to deviate from strict enforcement of the grooming standard. No exceptions are made to the "no beard" rule.

9. Mr. Ferguson was discharged by the terminal manager pursuant to the personal appearance directive, No. PR–14, paragraph three which states: "Beards, goatees, muttonchops or other facial hair growths of an extreme or bizarre type are neither acceptable or permissible and are calculated to impair the neat and tidy personal appearance which is critically requisite and accordingly may not be worn."

10. Mr. Ferguson has a skin condition known as pseudofolliculitis barbae (PFB).

This condition is caused by sharp tips of recently shaved facial hairs penetrating the skin and causing an inflammatory reaction. The disease occurs in persons with curly or kinky hair follicles. After shaving, the curved hair follicles cause the already curly hair to curve back into contact with the skin surface, pierce and reenter the skin, causing a pseudofollicle.

11. The inflammatory reaction may result in papules, pustules or abscesses. An individual with PFB may induce remission by growing a beard. Remission in such cases is nearly total and complete. An individual can, however, redevelop the disease by resuming shaving.

12. Mr. Ferguson was advised by his doctors to grow a beard as a curative and preventative measure. Other treatments, such as depilatories were unsuccessful, and in fact, aggravated the condition.[1]

13. Greyhound's supervisors knew of Mr. Ferguson's condition. They received the results of examinations and were aware that growing a beard was medically indicated.

14. The supervisors nevertheless did not permit Mr. Ferguson to hold a public contact job.

15. Mr. Ferguson has a severe case of PFB. Growing a beard was the only effective remedy.

16. In December of 1976 Mr. Ferguson desired a position as a ticket agent, a public contact position. Because he was unable to comply with the "no beard" policy, he was denied the position and was furloughed on September 11, 1976.[2]

---

[1]. Mr. Ferguson, pursuant to instructions from Greyhound, visited a free medical clinic and was examined by Dr. Michael DeWitt. Dr. DeWitt diagnosed his condition as PFB. Dr. DeWitt felt that it was "medically indicated for Mr. Ferguson to retain his beard." Mr. Ferguson was also examined by Greyhound's Company doctor, Dr. Richard Baker. Dr. Baker's records concerning his examination of Mr. Ferguson on September 10, 1976, state: "scars noted, shaving seems to produce abscesses . . . . I hereby do allow him to grow a beard."

In April of 1977, Mr. Ferguson went to a third doctor, Dr. John Covington. He diagnosed the condition as PFB, and also recommended that the plaintiff avoid shaving.

[2]. Mr. Ferguson was furloughed on September 11, 1976, January 11, 1977, September 10, 1977 and February 4, 1978 because under the applicable collective bargaining agreement his seniority date only allowed him to bid for jobs covered by the Company's personal appearance standards. Since Mr. Ferguson stated that he could not comply with these standards, he was furloughed.

17. Between November 1976 and January 1979 Mr. Ferguson was employed periodically by Defendant in non-public contact positions. He was qualified for the position of ticket agent, except for his inability to conform to the grooming regulations.

18. The evidence introduced at trial demonstrated that PFB is a disorder which predominately affects blacks.

19. The plaintiff's expert witness, Dr. A. Melvin Alexander, indicated that PFB, is a skin disorder that overwhelmingly affects black men who shave. Dr. Alexander cited studies and numerous articles to support his assertion that PFB is an immutable characteristic peculiar to members of the black race.[3]

20. Defendant's justification for the policy was based on its business judgment that consumers prefer clean shaven employees. It was based solely on opinion testimony of defendant's employees.

21. Although Greyhound described its competition with rivals as fierce, the evidence demonstrated that Greyhound has exclusive direct service to the following locations: Johnstown, Pa., State College, Pa., Harrisburg, Pa., Mt. Pocono, Pa., York, Pa., Lancaster, Pa., Pittsburgh, Pa., Elkton, Maryland, East Brunswick, N.J., Newark, N.J., and Jersey City, N.J.

22. Greyhound is the largest bus company in the world. It competes with Trailways in much of the eastern United States.

23. The correct comparison for purposes of computing back pay is between Mr. Ferguson and Daniel Brown. Mr. Brown was in the first pay step of the ticket agent position in September, 1976, the month in which Mr. Ferguson was denied the ticket agent position. This Court finds that Mr. Ferguson would very likely have had an employment record similar to Mr. Brown's.

## CONCLUSIONS

1. The EEOC has established by a preponderance of the evidence that Mr. Ferguson suffered from a serious case of PFB and that there was no satisfactory treatment for the disease other than growing a beard.

2. The disease of PFB is a skin disorder that primarily affects black males. Evidence at the trial demonstrated that the disease affects between 45 and 83% of all black males who shave.[4]

3. There is no contention that Greyhound adopted its "no beard" policy with the purpose or intent to discriminate against black employees. Plaintiff contends, however, that because the disease primarily affects black workers, that it nevertheless violates § 703 of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2:

(a) It shall be an unlawful employment practice for an employer—(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employ-

---

**3.** Dr. Alexander cited a study he completed with Dr. Delph in 1974. The subjects of the study were patients who had been admitted to a military hospital for conditions other than PFB. Fifty black males were chosen. Of these 45% had PFB and half of that number had a severe variety.

Another study cited by Dr. Alexander indicated that the prevalence of PFB could be as high as 83%.

The Court may properly consider Dr. Alexander's testimony on Dr. Arora's study. Rule 702, F.R.Ev.

**4.** Defendant alleges that blacks as a class are not underutilized in the Philadelphia Greyhound Terminal work force and that therefore the "no beard" policy has no discriminatory effect. This Court finds such an argument unpersuasive. In *Los Angeles Department of Water and River v. Manhart*, 435 U.S. 702, 708, 98 S.Ct. 1370, 1375, 55 L.Ed.2d 657 (1978) the Court, in discussing Title VII violations, noted that "[t]he statute's focus on the individual is unambiguous. . . ." Thus the basic policy of the statute requires this Court "[to] focus on fairness to individuals rather than fairness to classes." *Id.* at 709, 98 S.Ct. at 1376.

ee, because of such individual's race, color, religion, sex, or national origin.

4. In a Title VII case the plaintiff bears the initial burden of making out a prima facie case. *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 336, 97 S.Ct. 1843, 1854, 52 L.Ed.2d 396 (1977); *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975); *McDonnell Douglas v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). The Court concludes that the plaintiff has established a prima facie case of discrimination. It is well established that Title VII prohibits even racially neutral employment policies if such policies have a disparate impact on a particular racial group. *General Electric v. Gilbert*, 429 U.S. 125, 137, 97 S.Ct. 401, 408, 50 L.Ed.2d 343 (1976); *McDonnell Douglas v. Green, supra* 411 U.S. at 802, 93 S.Ct. at 1824. The "no beard" policy, while racially neutral on the surface, in fact has a discriminatory impact on black employees. Black males who are otherwise qualified, are barred from higher paying positions solely because of a condition peculiar to their race.

5. Once discriminatory impact has been shown, the employer must demonstrate that the work requirement has "a manifest relationship to the employment in question." *Griggs v. Duke Power*, 401 U.S. 424, 432, 91 S.Ct. 849, 854, 28 L.Ed.2d 158 (1971). The requirement "must be shown to be necessary to safe and efficient job performance to survive a Title VII challenge." *Dothard v. Rawlinson*, 433 U.S. 321, 332 n. 14, 97 S.Ct. 2720, 2728, 53 L.Ed.2d 786 (1977). The burden on Greyhound is to prove the business necessity of its actions by a preponderance of the evidence. *Dickerson v. U.S. Steel Corp.*, 472 F.Supp. 1304 (E.D.Pa.1978); 17 FEP Cases 1589. *Croker v. Boeing Co.*, 437 F.Supp. 1138 (E.D.Pa.1977).

6. This Court believes that correct standard for defining the business necessity defense is contained in *Robinson v. Lorillard*, 444 F.2d 791, 798 (4th Cir. 1971); *cert. denied*, 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655 (1971); and *cert. denied*, 404 U.S. 1007, 92 S.Ct. 651, 30 L.Ed.2d 655 (1971), where the court indicated that

"The test is whether there exists an overriding legitimate business purpose such that the practice is necessary to the safe and efficient operation of the business. Thus, the business purpose must be sufficiently compelling to override any racial impact; the challenged practice must effectively carry out the business purpose it is alleged to serve; and there must be available no acceptable alternative policies or practices which would better accomplish the business purpose advanced, or accomplish it equally well with a lesser differential racial impact. (Footnotes omitted)."

7. Under this test the Court concludes that Defendant's business necessity defense must fail. This Court finds that the regulation before this Court is not sufficiently compelling to justify its negative racial impact. The evidence introduced at trial was limited to conclusory allegations about consumers and their preferences. Greyhound alleged that it would be more competitive as a transportation company if its ticket agents were beardless. Defendant speculated that its grooming policy was perceived by consumers as evidence that Greyhound employees were disciplined and that the public would infer safety from this perception of discipline. It failed to introduce any survey or polling data or other documentary evidence to substantiate these claims. The current policy is simply unreasonable—both in terms of its rigidity and its lack of documented impact on consumers. The regulation is not necessary for "the safe and efficient operation of the business." *Robinson, supra*, 444 F.2d 798. This Court, upon reviewing the testimony of Greyhound's employees, finds that defendant has not established a business necessity defense by a preponderance of the evidence. *Dickerson, supra.*

8. Defendant finds support in *Woods v. Safeway Stores, Inc.*, 420 F.Supp. 35 (E.D. Va.1976), *aff'd.* 579 F.2d 43 (4th Cir. 1978), *cert. denied*, 440 U.S. 930, 99 S.Ct. 1267, 59

L.Ed.2d 486 (1979) in which the District Court upheld a regulation similar to the one in the present case. The Court noted that "[t]he evidence adduced . . . does establish that the "no beard" policy can act to disqualify an otherwise qualified black from employment solely on the basis of a genetic characteristic peculiar to his race [5]," *Id.* at 42. The Court held, however, that the policy did not violate Title VII because it was justified by a legitimate business purpose. The circumstances in *Woods,* however, make it distinguishable from the present case.

In *Woods* the Court noted that the industry involved was "[a] retail food business, a highly competitive multi-denominational industry." *Id.* at 43. Further the court indicated, "[s]ince the product sold is intended, for the most part to be consumed, overall store hygiene and an appearance of cleanliness is an important aspect of consumer preference." *Id.*

The considerations outlined by the *Woods* court are less compelling in the present case. First, hygienic considerations are far more compelling in the retail food industry than in the transportation industry. A retail food business is by nature required to monitor the personal hygiene of its employees. Thus while the grooming regulations appear similar on their face, the "no beard" policy in *Woods* is far more tied to the efficient and safe operation of the food business than the regulation in the present case.[6]

Second, the competitive situation of Safeway in the *Woods* case was far more precarious than that in the present case. The *Woods* Court described the retail food business as a "multi-denominational industry"; evidence presented in the instant case indicated that Greyhound is the largest intercity bus company in the world. Testimony revealed that on many routes from Philadelphia, Greyhound has the exclusive or the most frequent direct service. Thus, from a competitive standpoint, Greyhound is in a far more dominant position in its industry than Safeway is in the retail food industry.

Given the competitive picture of the retail food industry and the inherent hygienic concerns of that industry, the regulation in *Woods* seems far more reasonable than that in the present case. To the extent that this decision is inconsistent, with deference, this Court declines to follow *Woods'* reasoning.

9. In awarding back pay, this Court finds that the proper comparison is between Mr. Ferguson and Mr. Brown. Mr. Brown began as a ticket agent during September, 1976—the month Mr. Ferguson was first denied the position because of his inability to comply with the grooming regulation. At that time Mr. Ferguson had both the seniority and qualifications to become a ticket agent.

10. Mr. Ferguson's back pay award should encompass the period from September 1976 until the date of this decision. The parties have stipulated to an award which covers the period from September 1976 through January, 1979. In the accompanying Order, the parties will be directed to submit an amended stipulation as to the proper amount of damages to be awarded up to the date of decision.

11. The back pay award shall be reduced by any unemployment compensation received by Mr. Ferguson during this period.

---

**5.** It is important to note that the Court in *Woods* was satisfied that in severe form, PFB is peculiar to blacks.

**6.** Defendants also rely on prior court decisions upholding grooming regulations alleged to be discriminatory on the basis of sex. *Willingham v. Macon Telegraph Publishing Company,* 507 F.2d 1084 (5th Cir. 1975) (*en banc*); *Baker v. California Land Title Company,* 507 F.2d 895 (9th Cir. 1974); *Fagan v. National Cash Register Company,* 481 F.2d 1115 (D.C.Cir.1973); *Dodge v. Giant Food, Inc.,* 488 F.2d 1333 (D.C.

1973) (*per curiam*). This reliance is misplaced. These cases dealt with the question of whether an employer is guilty of a Title VII violation because he refuses to allow male employees to wear long hair. They uniformly held that an employer's refusal to accede to employee preference was not a Title VII violation. In the present case, however, the issue is not preference but medical necessity. Mr. Ferguson grew a beard and declined to comply with defendant's grooming regulation solely because of a medical condition peculiar to his race.

*Ostapowicz v. Johnson Bronze Company,*
541 F.2d 394 (3d Cir. 1976).