**Andrew WOODS, Plaintiff,**

v.

**SAFEWAY STORES, INC., Defendant.**

**Civ. A. No. 75–0321–R.**

United States District Court,
E. D. Virginia,
Richmond Division.

July 15, 1976.

Robert B. Fitzpatrick, Washington, D. C., Robert B. Wallace, Alexandria, Va., for plaintiff.

William H. King, Sr., John M. Oakey, Jr., James P. McElligott, Jr., Richmond, Va., for defendant.

## MEMORANDUM

MERHIGE, District Judge.

This action is brought by the plaintiff to redress an alleged violation of the provisions of Title VII of the Civil Rights Act of 1964, *as amended* 42 U.S.C. § 2000e *et seq.* Plaintiff seeks injunctive and other appropriate equitable relief including an award of back pay. Jurisdiction over the controversy is premised on § 706(f) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5(f), and by 28 U.S.C. § 1343(4).

The plaintiff, a black citizen of the United States, is a resident of the Common-

wealth of Virginia. Defendant Safeway Stores, Inc. (hereinafter "Safeway") maintains a chain of retail grocery stores throughout the Commonwealth of Virginia, one of which, Store No. 365, is located in Hampton, Virginia. Safeway is a Maryland corporation with its principal office in Oakland, California and is an employer within the meaning of § 701(b) of Title VII of the Civil Rights Act of 1964, *as amended,* 42 U.S.C. § 2000e(b).

The Court makes the following findings of fact and conclusions of law:

In November, 1973, plaintiff, then 19 years of age, applied for a position at defendant's Store No. 365, Hampton, Virginia. Upon the recommendation of another black employee, he was hired by the store manager.[1] Pursuant to directions, he reported to work on Monday, November 12, 1973, and continued his employment at that facility until discharged on June 28, 1974. The basis of the discharge was the plaintiff's failure to adhere to the defendant's local employee grooming code;[2] the plaintiff grew a beard on advice of his dermatologist in the treatment of a condition of pseudofolliculitis barbae ("PFB"), a condition that afflicts, almost exclusively, members of the black race.

On July 2, 1974, through Local 233 of the Retail Clerks International Association, plaintiff filed a grievance against the defendant. Subsequent to an appropriate hearing, and in a decision dated December 4, 1974, the arbiter found against the plaintiff. No allegation had been made in that proceeding of racial discrimination; the sole issue before the arbitrer was whether the plaintiff had been discharged for proper cause.

On December 30, 1974, plaintiff filed a sworn charge with the Equal Employment Opportunity Commission ("EEOC") against the defendant in which he alleged that his discharge was racially discriminatory. On July 7, 1975, the EEOC issued to the plaintiff a notice-of-right-to-sue letter which he received on July 9, 1975. *See* § 706(f)(1) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5(f)(1). Thereafter, on July 14, 1975, plaintiff filed this action. Section 706(e) of the Act, 42 U.S.C. § 2000e–5(e), requires a charging party to file a charge with the Equal Employment Opportunity Commission "within 180 days after the alleged unlawful employment practice occurred . . . ." The date of discharge as to the plaintiff was June 10, 1974. It was not until 203 days later, December 30, 1974, that plaintiff filed a charge against the defendant. Ordinarily, in the absence of a tolling of the requirements of Section 706(e), plaintiff's instant claim would be time barred. *See Burwell v. Eastern Air-*

---

1. The Court finds, however, that the plaintiff was not informed of the grooming regulations until he had given up other employment and had begun work at Safeway. Accordingly, the parties will be requested to submit briefs on whether, pursuant to this finding, the plaintiff may recover on any pendant state claims.

2. The Safeway "Employee Handbook" contains the following passage:

 *Personal Appearance and Cleanliness.* Customers like to shop in a store where the atmosphere is friendly and helpful. In comparing one store with another, the customer may say that one has "personality" or a good image where the other is unfriendly or cold. Consistently well groomed and friendly employees help to create the image or "store personality" we seek. The customers recognize this atmosphere in a store and it influences their store selection.

 It is the responsibility of management to establish personal appearance and grooming standards so that employees will know what is expected of them. It is impossible and impractical to spell out every possible detail in this area. However, the general standard for our store employees are outlined and illustrated here in these pages. If you have any questions concerning these policy standards, you should discuss them with your manager.

 We should all strive to present our best personal appearance, and that is all that the Company asks or wants.

 \* \* \* \* \* \*

 *Personal Appearance Male Store Employee.*

 \* \* \* \* \* \*

 Face must be smooth shaven. Mustaches are permitted, but if worn should not extend below the lower lip. Goatees of any style are not permitted. . . .

*lines, Inc.,* 68 F.R.D. 495 (E.D.Va.1975). For reasons which follow, however, the Court, while of the view that a resort to the grievance process does not toll the limitations period, holds that the plaintiff's claim is nevertheless not time barred.

Prior to the Supreme Court's rulings in *Johnson v. Railway Express Agency,* 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975), and *Alexander v. Gardner-Denver Co.,* 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974), with few exceptions courts that had occasion to address the issue concluded that the filing of a labor grievance procedure did toll the filing time requirements of the Civil Rights Act of 1964. *E. g., Sanchez v. Trans World Airlines, Inc.,* 499 F.2d 1107 (10th Cir. 1974); *Moore v. Sunbeam Corp.,* 459 F.2d 811, 826–27 (7th Cir. 1972); *Malone v. North American Rockwell Corp.,* 457 F.2d 779 (9th Cir. 1972); *Hutchings v. United States Industries, Inc.,* 428 F.2d 303 (5th Cir. 1970). *Cf. Reynolds v. The Daily Press, Inc.,* 5 EPD ¶ 7991 (E.D.Va.1972) (dicta); *Phillips v. Columbia Gas of West Virginia, Inc.,* 347 F.Supp. 533, 538 (S.D.W.Va.1972) (dicta) *aff'd,* 474 F.2d 1342 (4th Cir. 1973). Subsequent to the aforementioned Supreme Court rulings, however, courts reconsidered, holding that the filing of a grievance will not toll the jurisdictional requirements of the Act. *Guy v. Robbins & Myers, Inc.,* 525 F.2d 124 (6th Cir. 1974), *cert. granted* (1976); *Roberts v. Lockheed Aircraft Corp.,* 11 FEP Cases 1440 (C.D.Calif.1975), *reconsidered and vacated on other grounds* (C.D. Calif., Feb. 5, 1976). *But see Caldwell v. Seaboard Coast Line Railroad,* C.A. No. C–C–75–133 (W.D.N.C. April 8, 1976).

In *Alexander v. Gardner-Denver Co., supra,* the Supreme Court held that an individual is entitled to a de novo consideration of his/her Title VII cause of action in spite of the fact that he/she has pursued a labor grievance procedure to its completion. While that case is not dispositive of the question presented in the instant action, it does contain colorable language on the relationship between Title VII and the grievance process of collective-bargaining agreements.

Title VII does not speak expressly to the relationship between federal courts and the grievance-arbitration machinery of collective-bargaining agreements. It does, however, vest federal courts with plenary power to enforce the statutory requirements; and it specifies *with precision* the jurisdictional prerequisites that an individual must satisfy before he is entitled to institute a lawsuit. In the present case, these prerequisites were met when petitioner (1) filed a *timely* charge of employment discrimination with the Commission and (2) received and acted upon the Commission's statutory notice of the right to .sue. 42 U.S.C. §§ 2000e–5(b), (e), and (f).

415 U.S. at 47, 94 S.Ct. at 1019. (Emphasis added).

In submitting his grievance to arbitration, an employee seeks to vindicate his contractual right under a collective bargaining agreement. By contrast, in filing a lawsuit under Title VII, an employee asserts independent statutory rights accorded by Congress. The distinctly separate nature of these contractual and statutory rights is not officiated merely because both were violated as a result of the same factual occurrence. And certainly no inconsistency results from permitting both rights to be enforced in their respectively appropriate forums.

415 U.S. at 49–50, 94 S.Ct. at 1020.

Both rights have legally independent origins and are equally available to the aggrieved employee.

415 U.S. at 52, 94 S.Ct. at 1022.

[I]n instituting an action under Title VII, the employee is not seeking review of the arbitrator's decision. Rather, he is asserting a statutory right independent of the arbitration process.

415 U.S. at 54, 94 S.Ct. at 1022. The Court in that case specifically and emphatically noted that the arbitration process established in collective bargaining agreements and the adjudication process established in Title VII of the Civil Rights Act of 1964 are completely distinct and independent processes.

In *Johnson v. Railway Express Agency, supra,* it was held that the timely filing of an employment discrimination charge with the EEOC, pursuant to § 706 of Title VII of the Civil Rights Act of 1964, did not toll the running of the limitation period applicable to an action based on the same facts brought under the Civil Rights Act of 1866, 42 U.S.C. § 1981. The Court noted that since there is no relevant federal statute of limitations for a cause of action under § 1981, the controlling period was one provided in that instance by the law of Tennessee. It was noted that Tennessee statutes explicitly provided no tolling exceptions applicable to the case, and that a failure to toll the limitation period in issue would not seriously conflict with the purposes of Title VII.

> Petitioner argues that a failure to toll the limitation period in this case will conflict seriously with the broad remedial and humane purposes of Title VII. Specifically, he urges that Title VII embodies a strong federal policy in support of conciliation and voluntary compliance as a means of achieving the statutory mandate of equal employment opportunity. He suggests that failure to toll the statute on a § 1981 claim during the pendency of an administrative complaint in the EEOC would force a plaintiff into premature and expensive litigation that would destroy all chances for administrative conciliation and voluntary compliance.
>
> . . . But the fundamental answer to petitioner's argument lies in the fact—presumably a happy one for the civil rights claimant—that Congress clearly has retained § 1981 as a remedy against private employment discrimination separate from and independent of the more elaborate and time-consuming procedures of Title VII.

421 U.S. at 465–66, 95 S.Ct. at 1723. The Court continued, perhaps revealing its overriding philosophy of the case in footnote 13:

> We note expressly how little is at stake here. We are not really concerned with the broad question whether these respon-

dents can be compelled to conform their practices to the nationally mandated policy of equal employment opportunity. If the respondents, or any of them, presently or actually engaged in such conduct, there necessarily will be claimants who are in a position now either to file a charge under Title VII or to sue under § 1981. The question in this case is only whether this particular petitioner has waited so long that he has forfeited his rights to assert his § 1981 claim in federal court.

421 U.S. at 467 fn. 13, 95 S.Ct. at 1723. Mr. Justice Marshall, with whom Justices Douglas and Brennan joined, dissented in part contending that the majority's failure to apply the tolling principle undermines the foundation of Title VII and frustrates the congressional policy of providing alternative remedies. "Forced compliance with a short statute of limitations during the pendency of a charge before the EEOC would discourage and/or frustrate recourse to the congressional favored policy of conciliation." 421 U.S. at 472, 95 S.Ct. at 1726.

Additionally, the majority rejected the argument that the timely filing of a charge with the EEOC has the effect of placing the charged employer on notice that a claim of discrimination is being asserted, thus alleviating the need for strict adherence to the limitations period. "Only where there is *complete identity* of the causes of action will the protections suggested by petitioner necessarily exist and will the courts have an opportunity to assess the influence of the policy of repose inherent in a limitation period." 421 U.S. at 467, fn. 14, 95 S.Ct. at 1724. (Emphasis added).

██ The import of the *Johnson* case is apparent; the policies behind Title VII do not support an argument for the tolling of a limitation period based solely on the pursuit of an independent remedy. Since the Supreme Court concluded in *Alexander* that labor arbitration and Title VII adjudications are distinct and separate procedures, it would be inappropriate for this Court to hold that an arbitration proceeding does toll

the limitations period congressionally enacted in Title VII.

The plaintiff has attempted to distinguish the *Johnson* holding on several grounds. First, it is argued that *Johnson* involved only a judgment on the values implicit in the Tennessee statute of limitation applied to 42 U.S.C. § 1981, and was not an evaluation of the policy behind Title VII. The language of the opinion is clearly to the contrary. *E. g.,* 421 U.S. at 465–66, 95 S.Ct. 1716. Second, it is argued that the policy of encouraging "in-house" resolution of claims through arbitration before the administrative machinery of the EEOC is engaged, is stronger than the policy of encouraging EEOC action before resort to the courts under § 1981. However, the answer to the former position applies with continued force to the latter—Congress clearly has created a remedy in Title VII that is separate and distinct from labor-agreement arbitration; it would be inimical to this independency to have one remedy toll the operation of the other. *E. g.,* 421 U.S. at 465–66, 95 S.Ct. 1716. Furthermore, while the court's holding may encourage employees to file grievances with the EEOC before arbitration is concluded, there is clearly room in the Title VII procedure for a court to stay any judicial action on a Title VII allegation until the arbitration has concluded. The end result therefore may not increase litigation in the courts, although it may well increase the number of *concurrent* EEOC administrative and labor arbitration proceedings. It is not at all clear that arbitration will be avoided, as is contended by the plaintiff. Third, it is argued that the purposes and rationales behind any limitation period have been satisfied by the prior resort to arbitration; the employer has been put on notice of the claim and may take steps to preserve his case. The Supreme Court has held, however, that the claims must be identical for the position to have substance. 421 U.S. at 566–67, fn. 14, 95 S.Ct. 1716. In the instant action, the arbitration did not involve any claims of racial discrimination, and it can hardly be said that the arbitration proceeding put the employer on notice of the claims asserted in the instant suit.

In a very real sense, the plaintiff "slept" on his claims of racial discrimination. Finally, it should be noted that there are no claims of government or employer delay or inducement to delay; the facts are plain—the plaintiff simply did not file within the specified time limit.

 The plaintiff's final contention in this regard, and one in which the Court concurs, is that if the Court holds as it does that the limitations period is not tolled by a resort to the grievance process under the principles of the *Johnson* decision, the holding should be given only prospective application from the date of the decision in *Johnson.* It is urged that since *Johnson* was decided in May of 1975, and the plaintiff filed his sworn charge with the EEOC in December of 1974, *Johnson* principles ought not be applied to the plaintiff so as to bar his claims in the instant action. Nonretrospectivity is controlled by the standards enumerated in the Supreme Court's holding of *Chevron Oil Company v. Huson,* 404 U.S. 97, 106–07, 92 S.Ct. 349, 355, 30 L.Ed.2d 296 (1971):

> In our cases dealing with the nonretroactivity question, we have generally considered three separate factors. First, the decision to be applied nonretroactively was to establish a new principle of law, either by overruling clear past precedent on which litigants may have relied, . . . or by deciding an issue of first impression whose resolution was not clearly foreshadowed . . . Second, it has been stressed that we "must . . . weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation." . . . Finally, we have weighed the inequity imposed by retroactive application, for "[w]here a decision of this court could produce substantial inequitable results if applied retroactively, there is ample basis in our cases for avoiding the 'injustice or hardship' by a holding of nonretroactivity."

(Citations omitted). Since (1) all previous authority on the issue had held that the pursuit of arbitration pursuant to a collective-bargaining agreement does toll the limitations period specified in Title VII, (2) the plaintiff would clearly be prejudiced by retroactive application, as his claim would be lost, and (3) Title VII evinces a strong policy in favor of airing employment discrimination grievances, this Court is satisfied that the *Johnson* principles, as applied in the instant case, should be given prospective effect from the date of that decision. *See Roberts v. Lockheed Aircraft Corp.,* Nos. 75–3093–JWC, 75–3095–JWC, 75–3111–JWC, 75–3112–JWC (C.D.Calif., Feb. 5, 1976), *Hambrick v. Royal Sonesta Hotel,* 403 F.Supp. 943, 944–45 (E.D.La.1975); *Bush v. Wood Brothers Transfer,* 398 F.Supp. 1030 (S.D.Tex.1975). Accordingly, the plaintiff will be considered as having filed a timely sworn charge with the EEOC.

■ Turning now to the merits of the controversy, it is plaintiff's position that he was discharged by the defendant on the basis of racially tainted criteria. Defendant's regulations on grooming [3] which included a prohibition against beards in its retail stores were admittedly violated by the plaintiff in his efforts to cure a skin condition—PFB. The violation led to his dismissal. PFB, colloquially known as "razor bumps" or "shaving bumps," is a condition far more common and much more severe among blacks than members of other races. It is caused by the ingrowing of hairs in the beard area of the face and neck. Regular shaving with a sharp blade is usually the precipitating stimulus, the hairs become sharpened points, and the natural curvature of the hair and the hair follicle—aggravated in blacks—facilitates ingrowth. Papules form where the hair is ingrown as the result of an inflammatory foreign body reaction. In severe reactions, papules may become pustules and subsequently abscesses. If the condition is not treated, a danger of permanent disfigurement of the face exists. The evidence satisfies the Court that in its severe form, PFB is peculiar to blacks.

The plaintiff, in an effort to conform with the defendant's grooming regulations, began by procuring shaves with electric clippers at a local barber shop. Understandably, the costs proved to be prohibitive. He thereafter attempted to remove his facial hair with a depilatory—a powder or cream that dissolves the hair above the skin line. The depilatory in plaintiff's instance caused his skin to redden and develop "bumps." He thereafter attempted to shave once with a bladed razor and twice with an electric razor but both techniques aggravated the inflammation of his skin. Plaintiff thereafter returned to the use of a depilatory and sought the assistance of a dermatologist. His dermatologist diagnosed his infliction as PFB, instructed him to discontinue shaving, and provided him with an explanatory note to his employer. Subsequent visits by the plaintiff to his dermatologist resulted in the same recommendation. Despite his doctor's letters and verbal communications of explanation, Safeway terminated plaintiff on account of the fact that he had a beard and hence was in violation of its grooming code.

The testimony of experts introduced at trial gives rise to a conclusion that from 45% to 55% of all black males are afflicted with a form of PFB, although the number affected by its severe stages is limited, and that the affliction is typically caused by cutting or clipping the hair close to the skin so as to create a hair lance that is, by curving growth, forced back into the skin. Furthermore, most blacks can avoid the condition by using a depilatory appropriately and in a timely fashion, or by having a barber shave them with the use of clippers. Once the affliction, however, has been contracted, treatment typically consists of growing the hair out into a beard until irritation subsides. It was estimated by at least one dermatologist that of those suffering from the condition 20–22% needed beard therapy. A second method, apparently preferred by doctors but usually not prescribed because of its tediousness, is to pluck individually the ingrown hairs from

---

**3.** See footnote 2 *supra.*

the skin. Thereafter, the skin is medically treated.

There is no contention here that Safeway adopted its grooming standards with the purpose or intent to discriminate against black employees. Indeed, until the filing of the complaint with the EEOC, there is nothing in ·evidence to indicate that Safeway had any knowledge of the condition known as PFB. Furthermore, the evidence is undisputed that Safeway applies the "no beard" policy uniformly to both white and black males. Plaintiff argues, however, that the grooming regulation *operates* to deprive him of employment on racially tainted criteria, and, accordingly, is a violation of § 703 of the Civil Rights Act of 1964, *as amended,* 42 U.S.C. § 2000e–2:

> (a) It shall be an unlawful employment practice for an employer—(1) to fail or refuse to hire or discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

The statute has been interpreted to prohibit even racially neutral employment practices if same have a significantly disparate impact on members of a distinct racial group, and if they cannot be justified by proven business necessity.

> What is required by Congress is the removal of artificial, arbitrary, and unnecessary barriers to employment when the barriers operate invidiously to discriminate on the basis of racial or other impermissible classifications.
>
> The Act proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation. The touchstone is business necessity. If an employment practice which operates to exclude Negroes cannot be shown to be related to job performance, the practice is prohibited.

*Griggs. v. Duke Power Company,* 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971). See also *Gilbert v. General Electric Company,* 519 F.2d 661, 664 (4th Cir. 1975); *Wallace v. Debron Corporation,* 494 F.2d 674 (8th Cir. 1974); *Gregory v. Litton Systems Inc.,* 472 F.2d 631–32 (9th Cir. 1972). The evidence adduced in the instant case does establish that the "no beard" policy can act to disqualify an otherwise qualified black from employment solely on the basis of a genetic characteristic peculiar to his race.

■ The Court concludes, however, that although some discriminatory impact may result from the "no beard" regulation, it does not violate the Act because the rule is justified by a legitimate business purpose. The business purpose doctrine was best stated for this jurisdiction by the late Judge Soberoff in *Robinson v. Lorillard Corp.,* 444 F.2d 791, 798 (4th Cir. 1971):

> The test is whether there exists an overriding legitimate business purpose such that the practice is necessary to the safe and efficient operation of the business. Thus, the business purpose must be sufficiently compelling to override any racial impact; carry out the business purpose it is alleged to serve; and there must be available no acceptable or alternative policies or practices which would better accomplish the business purpose advanced, or accomplish it equally well with a lesser differential racial impact. (Footnotes omitted).

Of necessity, however, the doctrine's application will vary with (1) the nature of the business involved, (2) the business practice employed, and (3) the degree of the discriminatory impact. In the *Robinson* case, for example, the Court dealt with a discriminatory seniority system in a tobacco plant. The system acted to continue the effects, for numerous employees, of a past history of intentional hiring discrimination. The

Court, quite understandably, applied a fairly stringent business purpose doctrine test.

In the instant case, the business involved is the retail food business, a highly competitive multi-denominational industry. Since the product sold is intended, for the most part to be consumed, overall store hygiene and an appearance of cleanliness is an important aspect of customer preference. It was the judgment of the Safeway management tending stores in the Virginia area, that a grooming code, maintaining an image of cleanliness, was necessary to attract and retain customers. The code was carefully drafted to prevent misunderstandings and any misuse of regulations by both employer and employee. The right of an employer to maintain grooming standards has been upheld in a plethora of Title VII litigation. *E. g., Brown v. D.C. Transit System, Inc.,* 523 F.2d 725 (D.C.Cir. 1975); *Willingham v. Macon Telegraph Publishing Co.,* 507 F.2d 1084 (5th Cir. 1975) (en banc); *Baker v. California Land Title Company,* 507 F.2d 895 (9th Cir. 1974); *Dodge v. Giant Food, Inc.,* 160 U.S.App.D.C. 9, 488 F.2d 1333 (1973); *Fagan v. National Cash Register Co.,* 157 U.S.App.D.C. 15, 481 F.2d 1115 (1972); *Boyce v. Safeway Stores, Inc.,* 351 F.Supp. 402 (D.D.C.1972); *Baker v. California Land Title Co.,* 349 F.Supp. 235 (C.D. Calif.1972). The defendant, exercising sound business judgment, concluded that a "no beard" rule was a necessary part of its grooming code.

It is of little consequence that other Safeway divisions in other parts of the country, or that other stores within the Hampton area permit their retail store employees to wear beards. The Court finds that it was the legitimate business decision of the defendant, reflecting on the local clientele, to prohibit beards in its Virginia stores, and that decision must be given appropriate deference. This is not to say, however, that appearance codes with provisions that have no basis or foundation in past history or practice, will be respected if discriminatory impact is shown. It is only those provisions that have a relation to existing human preference scales which will be countenanced.

Furthermore, in applying the business purpose standard, consideration must be given to the fact that the degree of impact of the employment practice in question is slight. The sole black that has been prejudiced by the "no beard" regulation appears to be the plaintiff, even though Safeway has a number of other black employees. The testimony at trial satisfied the Court that a substantial majority of black males either do not have PFB or can cope with it and continue to shave their faces if care is taken. The regulation is neutral on its face; no discriminatory intent was manifest, and no past discriminatory practice is perpetuated. Finally, it must be noted that Safeway did not rigidly apply the "no beard" policy. It permitted the plaintiff to continue to work for some time despite his beard, by scheduling his time to minimize customer contact, in the hope that the condition would improve. Plaintiff's termination was accompanied with a stipulation that he would be reinstated if the condition was corrected. Additionally, plaintiff was offered work in the defendant's warehouse, an area which did not require public contact and, therefore, had no grooming code. The location of the warehouse, however, proved to be a substantial distance from the plaintiff's home and was not a financially feasible alternative.

In conclusion, the Court finds that a business purpose exists to support defendant's "no beard" rule, and that the rationale behind the rule overrides the slight racial impact resulting therefrom.

An appropriate order will issue.