Ollie E. CHAPPELLE et al., Plaintiffs,

v.

E. I. DuPONT de NEMOURS & CO. et al., Defendants.

Civ. A. No. 75–0549–R.

United States District Court,
E. D. Virginia,
Richmond Division.

Sept. 15, 1980.

Henry L. Marsh, III, William H. Bass, III, Hill, Tucker & Marsh, Richmond, Va., for plaintiffs.

Jerry H. Brenner, Legal Dept., E. I. DuPont de Nemours & Co., Wilmington, Del., Lewis T. Booker, Virginia W. Powell, Hunton, Williams, Gay & Gibson, Richmond, Va., for E. I. DuPont de Nemours & Co.

Parker E. Cherry, Richmond, Va., for Ampthill Rayon Workers, Inc.

## MEMORANDUM

MERHIGE, Jr., District Judge.

This action was commenced on October 21, 1975. The representative plaintiffs are black males and the administratrix of the estate of a black male who were formerly employed by E. I. DuPont de Nemours & Co. ("DuPont"). Plaintiffs seek declaratory, compensatory and injunctive relief on behalf of themselves and all persons similarly situated. The original complaint alleged that defendants had engaged in racial discrimination in several respects including, inter alia, hiring, initial job assignments, promotion, training and transfers.

Many of the relevant facts have been determined by a stipulation of the parties. Stipulated exhibits have also been submitted by the parties. An amended complaint, substantially simplifying the matters in controversy, was filed on October 16, 1978. A hearing was held on the remaining factual issues and the parties adduced the testimony of their representatives. The matter is thus ripe for disposition on the merits.

Plaintiff Ollie E. Chappelle was a DuPont employee for many years until his retirement on March 1, 1975. Plaintiff Edward B. Thweatt was employed by DuPont in 1937 and retired on January 1, 1974. Plaintiff Beatrice J. Anthony is the administratrix of the estate of James Paul Anthony, decedent, who had been employed by DuPont and died during the administrative investigation of this dispute by the Equal Employment Opportunity Commission ("EEOC").

This matter was instituted as a class action. The Court ultimately defined the class as

All former and present black wage roll employees and applicants for wage roll employment in the Labor and Transportation Department of the Spruance Textile Fibers Plant of E. I. DuPont de Nemours & Co. in Chesterfield County, Virginia from January 8, 1970, to date.

Notice of the pendency of this action was mailed to each member of the class on or about June 15, 1978. No class member requested representation by individual counsel.

Defendant DuPont is a corporation organized under the laws of the State of Delaware, and is an employer within the meaning of 42 U.S.C. § 2000e(b). DuPont owns and operates the Spruance Textile Fibers Plant located in Chesterfield County, Virginia. Defendant Ampthill Rayon Workers, Inc. ("The Union") is a Virginia corporation. The Union is a labor organization within the contemplation of 42 U.S.C. § 2000e(d) and (e). The Union negotiates with DuPont on behalf of its members with regard to the terms and conditions of their employment.

The amended complaint charges defendants with racial discrimination in two respects. The parties have agreed that the remaining allegations of discrimination may be stated in the following manner: (1) Did the defendants discriminate against the members of the class on the basis of race on or about October 31, 1977, by assigning a construction crane to the Works Engineering Department which is principally composed of white employees, rather than to the Labor and Transportation Department, which is composed of a majority of black employees? (2) Have the defendants discriminated against members of the class on the basis of race by paying employees required to operate fork lift trucks in allegedly predominant white departments at a higher rate of pay than for fork lift operators in the Labor and Transportation Department?

The original complaint's other allegations of discrimination were dismissed, with prejudice, by stipulation of October 13, 1978.

The remaining allegations of discrimination heretofore referred to are claimed to support causes of action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* and the Civil Rights Act of 1866, 42 U.S.C. § 1981.[1] Jurisdiction over the subject matter of this action rests in the court pursuant to 28 U.S.C. § 1343 and 28 U.S.C. § 2201.[2]

The Court will address the allegations seriatim.

### Assignment of the Crane

#### A. *Title VII*

A Title VII claimant may advance alternative theories of discrimination. On the one hand, the plaintiff may allege that he has been treated differently by virtue of his race, color, religion, national origin or sex. Such overt discrimination is styled "disparate treatment". A more subtle, but no less objectionable form of discrimination is denominated "disparate impact." The plaintiff may advance these theories of discrimination as alternative grounds for relief with respect to the same employment practice, policy, or decision. *Wright v. National Archives & Records Service*, 609 F.2d 702, 710 (4th Cir. 1979).

In the case at bar, plaintiffs have placed principal reliance upon the disparate impact theory of discrimination. Defendants, on the other hand, have addressed issues from the perspective of disparate treatment analysis. As will be seen, *infra*, the two theories involve different modes of legal analysis. Each alternative will be considered, beginning with disparate impact. *Wright, supra* at 711 n.7.

The disparate impact theory of discrimination was, perhaps, best described in *Teamsters v. United States*, 431 U.S. 324, 97

S.Ct. 1843, 52 L.Ed.2d 396 (1977). The court there stated:

Claims of disparate treatment may be distinguished from claims that stress "disparate impact." The latter involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity.

*Teamsters, supra* at 336, 97 S.Ct. at 1855. The disparate impact theory of discrimination is a judicial creation, *see Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), which was not considered by Congress when it enacted Title VII. It has, nonetheless, proven to be an effective means of eliminating subtle forms of discrimination which erect "built in head–winds" for minority groups. *Griggs, supra* at 432, 91 S.Ct. at 854; *Wright, supra* at 713.

The disparate impact case necessitates a two–step inquiry. The plaintiff's prima facie case is established by proof of an employer's practice which, while facially neutral, results in a disproportionate burden upon a protected group. *Dothard v. Rawlinson*, 433 U.S. 321, 329, 97 S.Ct. 2720, 2726, 53 L.Ed.2d 786 (1977); *Griggs, supra* 401 U.S. at 430, 91 S.Ct. at 853. The defendant must then show that the challenged practice is founded upon business necessity.

The business necessity defense is as narrow as its name implies:

[T]he applicable test is not merely whether there exists a business purpose for adhering to a challenged practice. The test is whether there exists an overriding legitimate business purpose such that the practice is necessary to the safe and efficient operation of the business. Thus, the business purpose must be sufficiently compelling to override any racial impact; the challenged practice must effectively

---

1. Plaintiffs also asserted a constitutional basis for their claims. That theory was apparently abandoned, for the plaintiffs offered no evidence of "state action" to support a claim under the Fourteenth Amendment to the United States Constitution.

2. The amended complaint also claimed The Back Pay Act, 5 U.S.C. § 5596 as a basis for jurisdiction. The Court cannot understand the relevancy of The Back Pay Act to this action.

carry out the business purpose it is alleged to serve; and there must be available no acceptable alternative policies or practices which would better accomplish the business purpose advanced, or accomplish it equally well with a lesser differential impact.

*Robinson v. Lorillard Corporation,* 444 F.2d 791, 798 (4th Cir.), *cert. dismissed* 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655 (1971) (footnotes omitted). The employer's burden in this regard is not triggered, however, until plaintiff has established a prima facie case. For the reasons which follow, the Court is of the view that DuPont's decision to assign, as it did, the Austin–Western crane to Works Engineering, is not a practice encompassed by the disparate impact theory.

A host of facially neutral practices and standards have been found violative of Title VII's prohibitions under the disparate impact theory. The classic case involved employment tests or educational requirements which excluded minorities to a disproportionate extent. *Griggs, supra; Johnson v. Goodyear Tire & Rubber Co.,* 491 F.2d 1364 (5th Cir. 1974). Height and weight requirements have been found to discriminate against women. *Dothard, supra.* In *Green v. Missouri Pacific Railroad Co.,* 523 F.2d 1290 (8th Cir. 1975) an employer's refusal to hire persons convicted of a crime violated Title VII because the prohibition disqualified black applicants at a substantially higher rate than white applicants and was not supported by business necessity. Discharge of an employee as a consequence of his being garnished may also be prohibited where the policy disproportionately impacts upon a protected group. *Johnson v. Pike Corporation of America,* 332 F.Supp. 490 (C.D.Cal.1971).

■ The aforementioned cases are distinguishable from the matter before the court. Disparate impact analysis is properly applied where the discrimination results not from the decision to employ a challenged practice, but from its effect. The discriminatory effect then flows from some characteristic of the protected group; whether it be mutable or immutable. In the instant case, however, the effect of DuPont's decision resulted not from some characteristic of the plaintiffs, but from their assignment to Labor and Transportation.

It must also be emphasized that plaintiffs' assignment to Labor and Transportation is not a matter before the court. Plaintiffs agreed to dismiss, with prejudice, their claims premised upon a

> Denial of equal opportunities in hiring, initial job assignments, testing, seniority, job progression, transfers, promotions, training, and apprenticeships, because of race . . . .

Plaintiffs have thus abandoned any assertion that their initial or continued assignment to Labor and Transportation had a discriminatory basis. Consequently, they cannot show that the assignment of the crane affected them on the basis of race even indirectly.

In short, the Court is of the opinion that the assignment of the crane to Works engineering is not a policy or practice to which the disparate impact theory is addressed. The allegation of discrimination is of but a singular decision. Application of the disparate impact analysis would be exactly the "undisciplined extension" of the theory which *Wright* counseled against. *Wright, supra* at 713. The Court next considers the assignment of the crane under the disparate treatment theory.

■ The disparate treatment theory is probably the most easily understood form of discrimination. Schlei & Grossman, *Employment Discrimination Law* 15 (1976). It is such overt discrimination which concerned Congress in enacting Title VII. S.Rep. No. 1137, 91st Cong., 2d Sess. 4 (1970). Simply stated, disparate treatment refers to defendant's treating an individual or group differently on account of their race, color, religion, sex or national origin.

Disparate treatment analysis proceeds in three stages. It is incumbent upon plaintiff to prove a prima facie case of discrimination. Once a prima facie case is shown, the

burden of persuasion shifts to the defendant. The defendant may meet this burden, and rebut the presumption of the prima facie case, by offering some non–discriminatory basis for the conduct in question. The plaintiff is then afforded an opportunity to establish that the proffered justification is simply a pretext for discrimination. Plaintiff, of course, carries the burden of proof throughout this analysis. *Furnco Construction Corporation v. Waters*, 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1979).

The elements of the plaintiff's prima facie case in the disparate treatment analysis were set forth in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). In the context of discrimination in hiring, the prima facie case was said to be made out by plaintiff's proof

(i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

*McDonnell Douglas, supra* at 802, 93 S.Ct. at 1824 (footnote omitted). The instant case differs from *McDonnell Douglas, supra* in that the alleged discrimination occurred not in hiring, but in work assignments of present employees. The *McDonnell Douglas* test, however, is the benchmark for consideration of the case at bar. *See Id.* at n.13.

The Court is of the opinion that plaintiffs' prima facie case in the matter at bar includes the following elements: (i) that plaintiffs belong to a racial minority; (ii) that plaintiffs sought and were qualified to operate the Austin–Western crane; (iii) that despite plaintiffs' qualifications they were denied the assignment; and (iv) that the assignment was subsequently made to persons of similar qualifications. For the reasons which follow, the Court has concluded that plaintiffs have established a prima facie case.

Plaintiffs are members of one of Title VII's protected groups; a racial minority. Moreover, certain stipulated facts regarding DuPont's workforce are also relevant.

DuPont's Spruance plant opened in 1929. Separate lines of progression existed for black and white workers from 1929 until 1961, when they were abolished. In 1964 DuPont and the Union negotiated a new promotion structure for the Spruance facility. The new system established three sections for wage roll (hourly) employees for purposes of promotion: Product, Mechanical and Power Operations. The Product section combined formerly racially distinct lines of progression. One of the departments included in the Product section is the Labor and Transportation Department. Employees of the Works Engineering Department apparently may be classified in either the Mechanical or Power Operations sections; depending upon the employee's work tasks.

DuPont's wage roll employees are paid in accordance with a seven step wage scale. The hourly rate of pay increases with each step from wage scale one through wage scale seven. Labor and Transportation employees are classified as wage groups one through five. Works Engineering employees, however, are paid in accordance with wage groups four through seven.

In 1970 the Labor and Transportation Department was predominantly black; there were forty–three black and seven white employees. Labor and Transportation was comprised of thirty–four black and thirty–three white employees in 1975. By 1978, twenty–three blacks and forty–three whites were assigned to that department.

Works Engineering, on the other hand, was comprised of two black and 464 white employees in 1970. In 1975 the racial composition of the department remained predominately white; twenty–five blacks and 542 whites. In 1978 forty–seven blacks and 633 whites were assigned to Works Engineering.

Plaintiffs sought the crane assignment by virtue of Chappelle's meetings with DuPont

management and by attempting to raise the issue at a Union meeting. The evidence establishes that no DuPont employees were qualified to operate the Austin–Western crane at the time of its purchase. It appears, however, that Labor and Transportation heavy equipment operators were qualified to be trained on the new equipment.

Heavy equipment operators assigned to the Labor and Transportation Department have, for many years, operated a vehicle known as the "76" truck. That vehicle is a flatbed truck upon which a short hydraulic crane is mounted. *See* Exhibit B. Some Labor and Transportation employees thus had experience in operating small hydraulic cranes which would have been helpful in training on the Austin–Western crane.

The remaining elements of plaintiff's prima facie case need little discussion. Operation of the Austin–Western crane was assigned to the millwrights of the Works Engineering Department. The millwrights, like the heavy equipment operators of Labor and Transportation, required instruction on the new equipment.

The prima facie case is, of course, established by the Court's consideration of the plaintiff's evidence. This proof merely raises a rebuttable presumption of discrimination; it does not establish the merits of the plaintiff's claim. This presumption is raised because the defendant is presumed to act with some reason and the prima facie case tends to negate reasons other than discrimination.

■ The presumption of discrimination is rebutted by defendant's proof, that he based his employment decision on a legitimate consideration, and not an illegitimate one such as race." *Furnco, supra* 438 U.S. at 577, 98 S.Ct. at 2950. This is clearly and crucially distinguishable from the business necessity defense of disparate impact analysis. The defendant need not prove that he adopted the best or least discriminatory employment practice. Instead, he need only, "articulate some legitimate, nondiscriminatory reason" for his conduct. *Id.* at 578, 98 S.Ct. at 2950, quoting *McDonnell Douglas, supra* 411 U.S. at 802, 93 S.Ct. at 1824. A

review of the evidence in the instant case persuades the Court that defendants have satisfied this burden.

A brief consideration of the events and practices preceding DuPont's decision is appropriate to better comprehend the defendant's proferred justification. These facts are covered by the parties' Stipulation of Facts.

The "76" truck previously mentioned is incapable of all of DuPont's hoisting needs. Prior to August, 1971 DuPont met its needs for larger equipment by renting same from independent firms. The rented construction cranes were operated by an employee of the lessor. If rigging was required in connection with the operation of these cranes, that duty was performed by millwrights assigned to Works Engineering. It does not appear that Labor and Transportation employees were assigned any task related to the operation of the rented cranes.

In August, 1971 DuPont learned that it could purchase an Austin–Western crane from one of the Company's affiliates. The Austin–Western crane weighs approximately eight tons and is equipped with a forty foot boom. *See* Exhibit D. The crane could be purchased for $8,300. By contrast, DuPont paid $6,805 in crane rentals in the preceding calendar year. *See* Exhibit A. DuPont purchased the crane shortly thereafter. There is no dispute that DuPont's purchase of the Austin–Western crane was in its best business interest.

Thomas J. Lukish testified that DuPont management considered assigning operation of the Austin–Western crane to the Labor and Transportation Department. For several reasons, however, DuPont concluded that the millwrights would operate the crane. Those reasons constitute legitimate, nondiscriminatory justifications for DuPont's decision. Lukish's testimony reflects, in large part, an unsigned DuPont memorandum of October 1, 1971, and will be discussed in the following paragraphs. *See* Exhibit G.

Lukish testified that one of DuPont's chief concerns was that the Austin–West-

ern crane be operated by those employees responsible for its maintenance. The millwrights were responsible for the maintenance of all types of machinery and equipment. *See* Exhibit E. This justification was also consistent with DuPont's practice at other facilities. Lukish contacted five other DuPont plants and learned that four of them assigned operation of construction cranes to employees charged with their maintenance. Those assignments were made on that basis without regard to the employee's departmental assignment.

DuPont's decision was also influenced by the millwright's prior experience with construction cranes. The millwrights had performed the rigging services necessary to the operation of rented construction cranes. The millwrights had thus worked closely with and observed the use of the construction cranes.

DuPont's decision also reflected the company's concern that the Austin–Western crane be readily available for the Works Engineering Department's use. Lukish testified that on occasion the "76" truck was not always available for the millwrights' needs. Assignment to the millwrights thus entrusted operation of the crane to those who would require its services. Problems of delay were thus alleviated.

The millwrights' operation of the Austin–Western crane was more economical than operation by Labor and Transportation. This was the result of several factors. First, two millwrights were required for rigging. If a Labor and Transportation employee operated the crane, a third man was added to the crew. Under DuPont's approach, however, one of the millwrights would operate the crane after the rigging was completed. This not only saved the expense of a Labor and Transportation employee but, secondly, freed him to perform his regular duties in the time he would have waited for the rigging to be accomplished. Third, the millwrights would not be idle while awaiting the availability of either the crane or an operator. Fourth, as plaintiffs allege, DuPont's decision reduced "upgrading" and overtime in the Labor and Trans-

portation Department. The assignment to Works Engineering thus permitted a more efficient use of plant personnel.

■ The third and final branch of the disparate treatment analysis remains to be considered. The defendant's justification for its conduct is certainly no defense if it can be shown that the proffer is merely a pretext for discrimination. Evidence of pretext may relate to the conduct in question or collateral matters. *McDonnell Douglas, supra* at 807, 93 S.Ct. at 1826. Plaintiffs have attempted to impeach DuPont's justifications in several respects. However, plaintiffs' assertions are either insufficient or not supported by the evidence.

Plaintiffs stressed that the job description for Labor and Transportation's heavy equipment operators includes "oil and lubricate". This fact does not detract from DuPont's interest that the operator also perform maintenance on the crane. "Maintenance" is a broader duty than "oiling and lubricating".

Plaintiffs also emphasized that the Labor and Transportation employee's familiarity with the "76" truck would be advantageous in the operation of the Austin–Western crane. The Court has no doubt that it would be of some value. However, the two pieces of equipment are of unequal sophistication. *Cf.* Exhibits B and D. Further, even if it were sufficient, there is no evidence that heavy equipment operators would be more easily trained to operate the larger crane. In short, employees in the relevant job categories had useful, although different, experience. It was for DuPont, not the Court, to establish priorities between the two. *Furnco, supra* 438 U.S. at 578, 98 S.Ct. at 2950.

Chappelle testified that there had never been a problem of availability with regard to the "76" truck. Common sense necessitates that this generalization must be rejected. Some period of delay is inherent when equipment and personnel must be transferred throughout the plant.

As previously noted, the millwrights' operation of the Austin–Western crane was more economical than operation by Labor and Transportation employees. Plaintiffs' assertions to the contrary are based only on the millwrights' higher rate of pay and do not consider the requirements of the tasks.

Plaintiffs also assert that DuPont's decision reduced Labor and Transportation's workload by forty percent and was actually premised on DuPont's desire to avoid layoffs in the Works Engineering Department. The first assertion is rebutted by the stipulation establishing that the Labor and Transportation department's workforce increased over the years. Both assertions are rebutted by the fact that the crane resulted in new assignments which had no bearing on Labor and Transportation's prior duties and the fact that the crane was used infrequently. Furthermore, the Austin–Western crane was not intended to supplant the use of the "76" truck.

Plaintiffs also take issue with DuPont's characterization that the "76" truck would be used for "transportation" while the Austin–Western crane would be used for "movement". The former involves carrying loads some distance while the latter speaks to the positioning of loads. A comparison of Exhibits B and D supports this distinction. The Austin–Western crane is operated with lowered supports; it cannot be used for "transportation".

■ Plaintiffs have stressed DuPont's long history of overt discrimination between 1929 and 1961. This is relevant on the issue of pretext. *McDonnell Douglas, supra* 411 U.S. at 807, 93 S.Ct. at 1826. Equally relevant, however, is DuPont's voluntary elimination of the discriminatory practices prior to the effective date of Title VII.

Plaintiffs have also emphasized that DuPont's decision necessitated an amendment of the millwrights' job description and that this was not accomplished until several months after the assignment was made. This does not, in the Court's view, detract from DuPont's justification. First, assignment of the Austin–Western crane's operation was a new position; it could not be expected that it would have previously been included in a job description. Second, an assignment to Labor and Transportation's heavy equipment operators would also have necessitated a change in their job description.

The remainder of plaintiffs' assertions in this regard are premised upon alternatives open to DuPont which would have had less of an impact upon the Labor and Transportation Department. At the outset, it is not clear that DuPont's decision had an adverse impact upon that department's personnel. In any event, those assertions are raised in terms of the business necessity defense which has no application to the case at bar. Nor do they demonstrate that DuPont's proffered justifications were merely a pretext for discrimination.[3]

Plaintiffs' allegations against the Union were, in essence, that it acquiesced in or condoned DuPont's discriminatory practice. Because DuPont's conduct did not violate Title VII, the Union cannot be liable for whatever part it played in a lawful and nondiscriminatory employment decision.

B. *Section 1981*

■ As an alternative ground for relief, plaintiffs contend that the assignment of the operation of the Austin–Western crane to Works Engineering violated 42 U.S.C. § 1981. That section provides, in pertinent part:

All persons within the jurisdiction of the United States shall have the same right

---

**3.** Nor have plaintiffs challenged as discriminatory, the reason for their assignment to the Labor and Transportation Department. Plaintiffs agreed to dismiss with prejudice, all claims arising from a

    Denial of equal opportunities in hiring, initial job assignments, testing, seniority, job pro-

gression, transfers, promotions, training and apprenticeships, because of race. . . .

Plaintiffs have thus abandoned any claim that prior discrimination resulted in their being in a position to be affected by the assignment of the crane.

in every State and Territory to make and enforce contracts .... as is enjoyed by white citizens....

Defendants contend that a § 1981 cause of action is time–barred and, in the alternative, that they have not deprived plaintiffs of rights guaranteed by the statute.

In *Johnson v. Railway Express Agency*, 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975) the court held that the statutory period for commencing a § 1981 action was not tolled by the timely filing of a Title VII charge with the EEOC. The cause of action in the instant case accrued in October, 1971. The complaint in this action was not filed until October 21, 1975. An action under § 1981 would thus appear barred by Virginia's two year statute of limitation, Va.Code Ann. § 8.01–243 (Repl.Vol.1977), which is applicable to this action. *Patterson v. American Tobacco Co.*, 535 F.2d 257, 275 (4th Cir.), *cert. den.*, 429 U.S. 920, 97 S.Ct. 314, 50 L.Ed.2d 286 (1976); *Williams v. Norfolk & Western Railway Co.*, 530 F.2d 539, 541 (4th Cir. 1975).

Plaintiffs' claim would not be barred, however, if *Johnson, supra* is given only prospective application. *See e. g., Woods v. Safeway Stores, Inc.*, 420 F.Supp. 35, 38–39 (E.D.Va.1976) *aff'd* 579 F.2d 43 (4th Cir. 1978) (rationale of *Johnson* given prospective effect so that grievance procedure tolled period for filing Title VII charge.) For reasons which follow, however, the Court need not address this issue.

Section 1981 prohibits discrimination on the basis of race in the making of contracts. This provision prohibits racial discrimination in employment. *Johnson, supra*: *Brown v. Gaston County Dyeing Machine Company*, 457 F.2d 1377 (4th Cir. 1972). The foregoing discussion with regard to the Title VII claim, however, determined that defendants' actions were based upon legitimate, nondiscriminatory reasons. Plaintiffs' 42 U.S.C. § 1981 claim must therefore also fail.

*Fork Lift Operators' Wages*

Plaintiffs' remaining claim alleges that DuPont compensated two groups of fork lift operators at different wage scales on the basis of race. Medium equipment operators assigned to the Labor and Transportation Department operate fork lifts and are paid in accordance with wage group three. Shipping auxiliary operators, who also operate fork lifts, are paid wage group four wages.

In 1975 the Labor and Transportation Department was 51% black and 49% white. The Shipping Department was comprised of seven black employees (or 17%) and thirty-four white employees (or 83%). In 1978 both departments were predominantly white.

Defendants maintain that plaintiffs' Title VII claim is not properly before the court. This assertion rests upon defendants' belief that the alleged wage discrimination was not encompassed by either plaintiffs' EEOC charge or the agency's investigation. *Nance v. Union Carbide Corp.*, 540 F.2d 718 (4th Cir. 1976), *vacated on other grounds*, 431 U.S. 952, 97 S.Ct. 2671, 53 L.Ed.2d 268 (1977); *King v. Seaboard Coastline Railroad Co.*, 538 F.2d 581 (4th Cir. 1976). The Court need not resolve this issue, however. This claim is before the court by virtue of plaintiffs' reliance on 42 U.S.C. § 1981.

Plaintiffs' cause of action, in this regard, under 42 U.S.C. § 1981 is not barred by the Virginia statute of limitations. The alleged discrimination in compensation is in the nature of a continuing violation. *See, e. g., Johnson v. Railway Express Agency*, 421 U.S. 454, 467 n.13, 95 S.Ct. 1716, 1723 n.13, 44 L.Ed.2d 295 (1975); *White v. City of Suffolk*, 460 F.Supp. 516 (E.D.Va.1978).

The shipping auxiliary operators' job description is found in Exhibits L and M. These employees are responsible for several tasks in addition to the operation of the fork lifts. Shipping auxiliary operators receive finished product and calculate its net weight, prepare packing tickets, prepare and verify shipments and maintain records. These employees are also charged with some degree of inspection and quality control responsibility.

Labor and Transportation Department medium equipment operators are primarily responsible for the operation of load moving and similar equipment. Their specific tasks are related to that primary function. For example, medium equipment operators move pallets, arrange storage, perform routine oiling and lubrication of equipment, and grass cutting and snow removal. *See* Exhibit J.

Robert E. Moore testified on behalf of DuPont. Moore was a supervisor in the Shipping Department between 1971 and 1975. Moore was also a supervisor in the Labor and Transportation Department from 1975, at least until the trial of this matter until 1978. He was thus in a position to observe the duties actually performed by the two classes of employees. Moore testified that the Shipping Auxiliary operators and the medium equipment operators each performed duties consistent with their job descriptions. The Court accepts Moore's testimony.

The difference in wages for shipping auxiliary operators and medium equipment operators thus reflects the former's greater responsibility, skills and varying duties. Operation of fork lifts was but an incidental part of the shipping auxiliary operators' overall duties. The two job classifications were not similar. The wage differential thus results not from discrimination but from the fact that different tasks are performed. Consistent with this conclusion is the fact that heavy equipment operators assigned to Labor and Transportation who also operate fork lifts, are wage group four employees.

For the reasons previously stated the Court is of the opinion that judgment must be entered for the defendants.