Gladys Appleton **FURR**, Plaintiff,

v.

**GOODWILL INDUSTRIES REHABILITATION CENTER**, Defendant.

No. C–79–2159.

United States District Court,
W. D. Tennessee, W. D.

March 31, 1981.

**162**

Scott L. Kirkpatrick III, Memphis, Tenn., for plaintiff.

Robert L. Dinkelspeil, Memphis, Tenn., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

HORTON, District Judge.

After hearing and reviewing all of the evidence and considering the arguments of counsel, the Court makes the following findings of fact and conclusions of law in the case.

### FINDINGS OF FACT

1. The defendant, Goodwill Industries Rehabilitation Center (Goodwill), Memphis, Tennessee, is a United Way agency, which provides jobs for the mentally and physically handicapped. Defendant collects used clothing, furniture and other items from donors and those items are transported to the defendant's plant on Chelsea Avenue in Memphis where they are repaired by the handicapped and sent out to neighborhood Goodwill stores for resale. The local agency is autonomous but has an affiliation with a national office in Washington, D. C. The handicapped employees at Goodwill are referred to as clients and Goodwill services approximately 400 to 500 clients a year. The sales proceeds of repaired goods pay the salaries of the Goodwill clients and pay for the stores' overhead. The only employees of the defendant who are not handicapped are those employees in the Transportation Department whose job it is to drive the trucks and collect donated items.

2. The white, female plaintiff, Gladys Appleton Furr, had an employment history as a driver. In 1970 she had been a bus driver for Christian Brothers College (CBC), Memphis and had worked fifty hours a week, from 7:00 a. m. to 5:00 p. m. for $2.00 an hour for a gross pay of $100.00 per week. Due to the long hours at the job plaintiff decided to seek new employment. Prior to driving for CBC, plaintiff had driven a school bus at Lausanne School in Memphis in 1967–68. Plaintiff also had experience

working in department stores, having held a job with Atlantic Mills from 1959 to 1963 and at Woolco Department Stores in 1964 to 1966. After leaving CBC in 1970 plaintiff, whose husband had died in late 1968, spent from 1971 to 1973 seeking employment or recovering from a broken leg and caring for her grandchildren in her home.

3. On November 12, 1973, plaintiff answered an ad for a truck driver placed in the local newspapers by defendant. At that time she was on public assistance, had a ninth grade education, was fifty-seven years of age, and had a chauffeur's license. She filled out the employment application and then spoke with Mrs. Willa Rose Finley, who was then the defendant's personnel director. Mrs. Finley told plaintiff that she was hired as a night shift truck driver if she reported to the plant an hour early the next day and passed the truck driving test. At that time, the defendant had day shift truck drivers who picked up at residences articles that people had called to donate. On the day shift five trucks operated with a driver and helper in each truck and the shift ran from 8:00 a. m. to 4:00 p. m. The night shift, which involved only two trucks each with a driver and helper, drove from around 4:00 p. m. to midnight and collected the items which had been placed in or near collection boxes located in shopping center parking lots. The helper assisted the driver in loading the heavy items and in the case of a new driver, would help familiarize the driver with the route. (The defendant no longer utilizes this system but now places manned trailers in a few central locations. Once the trailers are full, an engine is attached and pulls them to the plant. Home pick-ups are made only for very bulky and valuable items.) Due to the low pay turnover was high among the drivers and helpers. Plaintiff reported to the plant on Chelsea at 3:00 p. m. November 13, 1973 and was taken out on the driving test by the Transportation Supervisor, Mr. Sherman Johnson, a black male. Mr. Johnson found plaintiff to be an excellent driver, well qualified to do the job, and did not foresee any problems with her ability to work with the helper to lift heavy objects.

He called Mrs. Finley and recommended that plaintiff be hired. Mrs. Finley then approved plaintiff for the job and had plaintiff sign a withholding tax form and plaintiff was officially hired.

4. Mr. Johnson then requested Mr. Early Scott, a 63 year old black man who was a night shift helper who trained new drivers on the route, to ride with the plaintiff. Mr. Scott told Mr. Johnson that he had always done everything that Mr. Johnson had asked him to do but he could not ride with plaintiff and would quit rather than ride with her. Mr. Scott told Mr. Johnson that he was afraid for both his own and Mrs. Furr's safety if he was seen riding in a truck at night with a white woman. On occasions at night young black men had thrown missiles at Goodwill trucks containing two black men or a black man and a white man. Mr. Johnson did not test Mr. Scott on his threat to quit by ordering him to go with plaintiff. Mr. Johnson called Mrs. Finley and reported Mr. Scott's refusal to ride with plaintiff to her. Mrs. Finley then spoke with Mr. Scott and Mr. Scott told her that he was more afraid for himself than for Mrs. Furr because the young black men on the street would question his being out in a truck with a white woman. Neither Mr. Johnson nor Mrs. Finley asked the other night helper to ride with plaintiff. He was a young white man who was mentally retarded, did not have the ability to instruct plaintiff on the route and had little ability to exercise judgment. Mr. Johnson and Mrs. Finley each made a unilateral decision that plaintiff could not work with this helper. Mr. Johnson then asked each of the day shift drivers and helpers if they would work a double shift to show a new driver the route. All of them refused. Although Mrs. Furr's race and sex were not mentioned to these men, who were all black, plaintiff was sitting in Mr. Johnson's office at the loading dock and the Court infers they realized the driver was a white woman. Plaintiff was never told about the retarded night shift helper. After all the workers, except the retarded young man, had been requested to ride with plaintiff

and refused, Mr. Johnson sent plaintiff to Mrs. Finley's office. At no time did Mr. Johnson offer to go with plaintiff himself to show her the route nor did he offer to give her a map with the locations marked on it and let her ride with the retarded, white helper. At no time did Mr. Johnson order any employee to ride with plaintiff as a helper.[1]

5. Plaintiff returned to Mrs. Finley's office. Mrs. Finley told plaintiff that there was no alternative but to let her go because the boxes had to be emptied, plaintiff could not go by herself, and the night shift black male helper would not work with her. The white retarded helper was not mentioned to plaintiff. Mrs. Finley testified that she was very sorry for the plaintiff for she knew the plaintiff needed the job and could do the job. Plaintiff was fired but was told that she would be considered for a position as a store manager when it arose in the future. Plaintiff then left. On November 23, 1973, ten days after plaintiff had been fired, a black male was hired to fill the driving position.

6. At the time when plaintiff was hired, new drivers were paid $1.85 an hour for the first three months and then upped to $2.00 an hour and after that merit raises were received.

7. In November of 1973 the city was not in a state of unrest racially as defendant would have the Court believe. The entire basis for this contention was the fact that on several occasions the night drivers had reported that bottles or other missiles had been thrown at the trucks by young black males. Such vandalism does not rise to the level of racial unrest or violence.

8. Plaintiff was the first white person to apply for the job as a driver and was the first woman to apply. After plaintiff was fired, white male drivers were hired and one black female driver worked for a while. There has never been another white female driver. No other white woman has applied. There were no incidents with the black helpers refusing to work with either the white men or black woman. The black female driver worked with the retarded white male as a helper.

9. The black male who received the job after plaintiff was terminated received $1.85 for the first three months, then was raised to $2.00 an hour and in April, 1974 was raised to $2.50 an hour.

10. On November 14, 1973, Mrs. Furr called Mrs. Finley and for the first time found out the company refused to place her with the white helper and that there were other black helpers who also declined to ride with plaintiff. Mrs. Furr then became angry and told Mrs. Finley that it looked like a case of discrimination for the EEOC. In the heat of anger plaintiff told Mrs. Finley that she would not work for the defendant even if they offered her a job due to the way they had treated her over the truck driving position. Mrs. Finley stated that she did not blame plaintiff for being upset, for she would have been upset if the same thing had happened to her. Nevertheless, Mrs. Finley never called plaintiff for a store manager position even though many such positions came open due to Mrs. Furr's statement in anger about not wanting to work for defendant. Plaintiff likewise never approached defendant for another job.

11. Plaintiff filed her charge with the Equal Employment Opportunity Commission on November 19, 1973. After the conclusion of the EEOC investigation and the issuance of a right to sue letter, the plaintiff filed suit.

12. After she lost the job with defendant, plaintiff attempted to find other employment. Plaintiff admitted that for short periods of time, a week or two, she would get discouraged and stop looking for work due to depression over the fact that, at her age and education, the job with defendant was probably her last chance at a good job. Overall, plaintiff made a conscientious effort to obtain employment. The only period during which plaintiff did not look for a job was in 1979 when she suffered a fall and recuperated for approximately six

---

1. See transcript attached as Appendix.

weeks to two months. Plaintiff testified that if she had had a job at that time she would have gone to work but that due to the fact she could not move her neck during this period and assumed no one would hire her in such a condition, she stopped applying for jobs during this short period. During this period plaintiff also occasionally kept her grandchildren in her home. In her efforts to locate a job, plaintiff checked the want ads of the daily newspaper and would call about any job for which she felt she was qualified. She said that uniformly she was told that the company either wanted a man for the job or a younger person.[2] On one occasion plaintiff attempted a sales job for skin care products and cosmetics on a commission basis but this lasted only two months because she did not have success with it. Plaintiff would have gone to the employer's office to have put in an application when she called on a job if the company would have considered her. Due to the fact she was told each time on the telephone her age, lack of education or skills or sex disqualified her, she never submitted a job application for any position except the commission sales job. Plaintiff also contacted the state of Tennessee in regard to rehabilitation employment but this was unsuccessful. Plaintiff's daughter-in-law testified to the plaintiff's persistence in attempting to obtain employment after leaving the defendant. She testified that plaintiff continually tried to get jobs on a weekly basis the entire time this lawsuit was pending.

13. During this time plaintiff subsisted on food stamps and social security widow's benefits after she turned sixty in 1976. Plaintiff has not filed an income tax return since 1968 because she has not made enough money to be required to do so.

14. In April, 1980 plaintiff obtained her present job through a telephone call after reading an ad for a driver's position. Thus, when plaintiff was 64 she began work as a part-time driver with the Metropolitan Interfaith Association's (MIFA) senior citizens' program which transports the elderly to banks, doctors, grocery stores and pharmacies. This program did not begin until April, 1980. By the time of trial plaintiff had worked for this organization for approximately nine months. The co-ordinator of the program which employs plaintiff testified that plaintiff is an excellent employee and excellent record-keeper and is always willing to do whatever is asked of her. Her attendance record is perfect as she has always been there and has not missed a day, even when she had the flu. There have been no complaints about her performance.

CONCLUSIONS OF LAW

1. The Court has jurisdiction of this case under 42 U.S.C. § 2000e–5(f) and 28 U.S.C. § 1331(a).

2. The Court has jurisdiction over the employer who has more than fifteen employees under 42 U.S.C. § 2000e(b) and over the employee under 42 U.S.C. § 2000e(f).

3. Title VII specifically prohibits the discharging of any individual due to race or sex when it states:

It shall be an unlawful employment practice for an employer—

(1) to ... discharge any individual, because of such individual's race, color, ... [or] sex....

42 U.S.C. § 2000e–2(a)(1). The unusual twist to this case is that although plaintiff was hired without regard to race or sex, she was immediately fired because of her race and sex.

4. The plaintiff has established by a preponderance of the evidence a prima facie case of sexual and racial discrimination under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Plaintiff was hired as the first white female for a position as truck driver which up until her hiring had been an exclusively black male position. When the black male helper refused to ride with her because of her sex and race, the defendant made only minimal efforts to obtain another helper to ride with her, never offered to let her ride with the retarded

2. During this time plaintiff was between 57 and 64 years old.

white helper and never ordered anyone to ride with her. Instead, the company took the easy way out and fired plaintiff because her race and sex were unacceptable to its other truck driver/helper employees. There is no contention that plaintiff was unqualified for the job—defendant admits she was qualified. However, despite her qualifications, plaintiff, because of her race and sex, was immediately fired and was never given a chance to prove herself to the black workers or disprove Mr. Scott's fears of violence. After plaintiff was fired, the position was filled by a black male who had qualifications comparable to plaintiff's. Thus a prima facie case of discriminatory discharge has been established by a preponderance of the evidence. *McDonnell Douglas, supra.* Plaintiff has produced sufficient evidence to raise an inference of discriminatory intent. *Texas Dept. of Community Affairs v. Burdine,* —— U.S. ——, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

5. The defendant carried its burden to rebut the presumption of discrimination through the production of evidence that the firing of plaintiff was for legitimate, non-discriminatory reasons. *Burdine,* supra. In *Burdine,* the Supreme Court, in articulating the burden placed upon the defendant employer in a Title VII case, explained that:

> The defendant need not persuade the court that it was actually motivated by the proferred reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff. To accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection. The explanation provided must be legally sufficient to justify a judgment for the defendant. If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted, and the factual inquiry proceeds to a new level of specificity.

—— U.S. at ——, 101 S.Ct. at 1094 (citations and footnotes omitted). Defendant has put forth, as a legitimate nondiscriminatory reason for firing plaintiff, that she could not go out alone, none of the black helpers would ride with her and the boxes had to be emptied. Thus, defendant had to fire plaintiff and replace her with a driver satisfactory to the helpers. Due to *Burdine's* admonition that the Court does not have to be persuaded that the employer actually was motivated by these reasons in order for the defendant to carry its burden, the Court finds that defendant has produced a legitimate, nondiscriminatory reason for plaintiff's firing.

■ 6. However, "the presence in a respondent's mind of a 'business purpose' rather than a discriminatory motive for maintaining a challenged employment practice is not alone determinative of the validity of the practice." *Robinson v. Lorillard Corp.,* 444 F.2d 791, 796–97 (4th Cir.), *cert. denied,* 404 U.S. 1006, 1007, 92 S.Ct. 573, 651, 30 L.Ed.2d 655 (1971). The burden of persuasion, which remains with plaintiff, now gives her "the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision." *Burdine,* —— U.S. at ——, 101 S.Ct. at 1095. Plaintiff "may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* The Court finds that the defendant's assertion of business necessity as a defense does not meet the requirements in law for such a defense and that the defendant was more likely motivated by a discriminatory reason. Thus, plaintiff has carried her burden of persuasion.

The Sixth Circuit laid down the test to be utilized in passing on a defense of business necessity in *Head v. Timken Roller Bearing Co.,* 486 F.2d 870 (6th Cir. 1973). The Court of Appeals held that:

> The test is whether there exists an overriding legitimate business purpose such that the practice is necessary to the safe and efficient operation of the business. Thus, the business purpose must be sufficiently compelling to override any racial impact; the challenged practice must ef-

fectively carry out the business purpose it is alleged to serve; and there must be available no acceptable alternative policies or practices which would better accomplish the business purpose advanced, or accomplish it equally well with a less differential racial impact.

486 F.2d at 879. The Court finds that the firing of the plaintiff, as a truck driver, does not qualify as a practice necessary to the safe and efficient operation of the defendant's business. The defendant contended that there was no way to get the boxes emptied if plaintiff remained on the staff and that this would jeopardize the entire organization. However, it took defendant ten days to find a replacement for plaintiff.[3] In that ten days, plaintiff could have familiarized herself with the route and been able to ride with the white, retarded helper. The fears of one worker of a possibility of violence directed at the truck did not constitute a genuine threat to the safety and efficiency of the business. Although defendant asserted Mr. Scott was invaluable and if his threat to quit was carried out, the business would suffer, defendant terminated Mr. Scott seven months later. High turnover among drivers and helpers was commonplace to defendant. There was no compelling business purpose present. It is also clear to the Court that acceptable alternatives could have better accomplished or accomplished equally well the business purpose to keep the trucks rolling. If the supervisor, Mr. Johnson, had ridden with plaintiff, he could have familiarized her with the route. The defendant could have offered the plaintiff the option to ride with the retarded helper and could have given her a route map. The supervisor could have ordered Mr. Scott or any other black helper to ride with the plaintiff. Instead of attempting to employ any such alternative, the defendant took the easy way out and fired the plaintiff because she was a white female. It would set an invidious precedent for this Court to hold that an employer has a defense to treating applicants or employees in a discriminatory manner in contravention of Title VII merely because employees of a different race or sex do not want to work with persons of another race or sex. Mrs. Finley clearly stated that, but for the black employees not wanting to ride with plaintiff, she was well qualified for the job and plaintiff was terminated due to the dictates and preference of the black employees. No legally sufficient business necessity has been shown by defendant. Thus, the plaintiff has carried the burden of persuasion under Title VII and the Court finds defendant discriminated against plaintiff on account of her race and sex. Judgment is hereby awarded to plaintiff.

In regard to the relief authorized under 42 U.S.C. § 2000e–5(g) and (k), the Court observes that plaintiff has not requested reinstatement as she has a job with the Metropolitan Interfaith Association in Memphis (MIFA) as a driver which she wishes to retain. The Court will decree an award of some back pay to plaintiff along with costs and reasonable attorney's fees. However, the Court will defer awarding any specific sum and suggests that the attorneys attempt to reach a compromise settlement on the monetary issues. Counsel for plaintiff is to submit within thirty days of entry of this order financial data upon which the Court is to base the award of back pay and attorney's fees and costs. A copy of all such data is to be served upon counsel for defendant. Defendant is to be given ten days from receipt of this financial data to respond, if it so desires. Should the parties reach a settlement within the forty day period for the filing of the financial data, the Court will pass upon it reasonableness.

It therefore, by the Court

ORDERED that judgment is hereby rendered for the plaintiff. The Court retains jurisdiction of the case pending the resolution of the issues of back pay, attorney's fees and costs. Counsel for plaintiff is to

---

**3.** The job was not filled until November 23, 1973 although plaintiff was fired November 13, 1973.

submit to the Court, and serve upon counsel for defendant, financial data upon which the Court may base these awards within thirty days from entry of this order. Defendant shall have ten days from receipt of that data to respond. If the parties do not reach a settlement within forty days from entry of this order, the Court will then decree the amount of the award.

## APPENDIX

The above-styled case came on to be heard on this date, Monday, March 23rd, 1981, at Memphis, Tennessee, before the Honorable Odell Horton, Judge, presiding, without the intervention of a jury, when and where the following excerpts of testimony were given by the witnesses, Mrs. Willa Rose Finley and Mr. Sherman Johnson, on Tuesday, March 24th, 1981:

### WILLA ROSE FINLEY

The said witness, having been first duly sworn, testified as follows on direct examination by Mr. Dinkelspiel:

*DIRECT EXAMINATION*

*BY MR. DINKELSPIEL:*

Q. Did Mr. Johnson recommend to you that she be hired?

A. Yes, he did.

Q. And was she hired?

A. Yes, she was.

Q. Was she then terminated on November 13th?

A. I hesitate to call it terminating. Something arose over which I had no control, and I couldn't allow her to go out on a truck by herself.

Q. Tell the court, please, ma'am, why she did not remain an employee of Goodwill?

A. She came in that afternoon to take her driving test and she passed it with flying colors, and Mr. Johnson introduced Mrs. Furr to Mr. Early Scott, who was supposed to ride with her as a helper. Mr. Scott refused to go with Mrs. Furr, stating that he would fear for their lives. There was a lot of racial unrest in the city at that time as you all well know, and our boxes—we had some, almost a hundred or more, of those little boxes in the city. So they were placed all over the city.

And he said he was afraid primarily for the young black people who were so uptight about the racial situation at that time; that there might be some trouble, and he didn't want to be put in that position. He said he would fear more for himself, though, than he would for Mrs. Furr, because they would question his being out there with a white lady.

Q. Had there been any incidents around that time of missiles being thrown at Goodwill drivers as they were on their routes?

A. Not to my knowledge.

Q. Was there an attempt to get any other helpers to ride with Mrs. Furr?

A. I did not attempt, but Mr. Johnson did. He told me he did, yes.

Q. And what was the result of those attempts?

A. He said they refused also.

Q. Did you have a conversation with Mrs. Furr on November 17th, 1973, when you told her about the problem of getting a helper to ride with her?

A. Yes. After Mr. Scott refused to go, and I had had him come up to my office and talked to him, as well as Mr. Johnson had already talked to him, and he told me the same thing; that he wouldn't go. So then I asked them to have Mrs. Furr come back up to my office, and I told her what the situation was, and I didn't have any alternative. The boxes had to be made. They were out there full of material, and the people in the shopping centers would not stand for them being there, you know, day on end with things piled all around them. It would create a situation that would be unsightly, and that the trucks had to roll, and I had no alternative.

Q. Would there have been any effect on Goodwill's business if those boxes had not been collected?

A. Yes. We collect a great deal of material from those boxes as well as from the

homes, and it would have jeopardized some jobs had we not picked up the merchandise.

Q. What sort of relationship did you have with the owners of the shopping centers who permitted you to leave the boxes in the shopping centers?

A. I had nothing to do with it. The public relations director did this, had communication with them.

### SHERMAN JOHNSON

The said witness, having been first duly sworn, testified as follows on cross examination by Mr. Kirkpatrick?

*CROSS EXAMINATION*

*BY MR. KIRKPATRICK:*

Q. Mr. Johnson, let's talk about all of these other—I believe there are five helpers at this time that were black in addition to the white helper, is that correct?

A. Yes.

Q. All right. Now, Mr. Scott said he wasn't going to go with her, is that correct?

A. That's right.

Q. And then you went to the other four and asked them if they would go with Mrs. Furr, is that correct?

A. I don't know if it was four or not. I asked several. I don't recall the numbers other than Scott, but I asked several if they could go.

Q. Let me ask you—how did you ask them? Did you just walk up and ask "Would you mind being a helper with Mrs. Furr"? How did you phrase the question?

A. No. I said that I have—I said, "I am short of a helper and would you go out with this new driver tonight?"

I had several different excuses. I don't recall what they were, but they didn't go.

Q. Did you when you asked the others, did you say, "Would you go out with a white female"?

A. No; that never entered into it.

Q. So when you asked these people, you didn't even mention that she was a white female in terms of going out—they just had other reasons why they wouldn't go out, double shift or whatever? They didn't know what kind of driver you were talking about?

A. I don't recall what the circumstances were at that point, because where we were standing talking as they were pulling in— my office was at the back of the loading dock, and where we were standing talking, naturally I couldn't say whether they knew that she was to be the driver that they were to go with or not.

Q. But you just testified that you didn't tell them, "Would you go out with a female white?" You just said, "Would you be a helper"?

A. Would you go out as the helper on this night run.

Q. Were you their supervisor?

A. Yes.

Q. In other words, did they report to you?

A. Right.

Q. Did you ever instruct any of them to be the helper of Mrs. Furr as their boss?

A. Other than Mr. Scott, and those that I asked—no, I didn't instruct them to go with her as their boss, no.

Q. Mr. Johnson, if your only problem with a white helper is the fact of a route thing, did it ever occur to you to take Mrs. Furr out and show her the route, so that from that point forward she would know the route and could work with a white helper?

A. No, it didn't.

Q. Why didn't it?

A. Now, I don't know how to answer that, really, but it didn't.

Q. You were very upset at the fact of what happened, weren't you?

A. No.

Q. You got a phone call and you were very upset about it?

A. No, I wasn't upset.

Q. You weren't upset about the fact that Mrs. Furr was fired because nobody would go out with her?

A. Like I stated before, when I requisitioned a person for the department, the personnel officer would send them to me, and then after the test, if we could use them, or if something came up that we couldn't, I sent them back to personnel, to the personnel office, and let them work that out.

Q. Mr. Johnson, we have had an exhibit introduced here today that showed all sorts of individuals, not only just the drivers of the trucks, and helpers, but all kinds of other people in your transportation department—is that correct? There are all other kinds of employees out there besides the ones that just go out in the trucks?

A. Yes.

Q. And they are familiar with the routes, too, is that correct?

A. Yes.

Q. Many of them are?

A. Many of them are.

Q. Did you ever ask any of the other members that are familiar with the routes to go out with Mrs. Furr and show her the route where she would know the route and then she could work with the white retarded individual?

A. All right. Now, you say several other people under my supervision?

Q. Yes.

A. Those people in the office are handicapped people, and couldn't any of those have gone. Some of them are in wheelchairs or—

Q. (Interposing) I am not talking about the wheelchairs. I am just talking the many of them or any of them that were working out there, why didn't you send somebody, anybody out on the route if your only concern was teaching her the route, and you didn't feel like she could drive with a route sheet in front of her, why didn't either you go or one of the other people, the many other people who could have gone, go and show her the route, and then she could start off the next day with this white retarded person?

A. Like I say, that didn't occur to me.

Q. That just didn't occur to you?

A. No; and—

MR. KIRKPATRICK: That is all I have.

THE WITNESS: Okay.

THE COURT: You may finish your answer.

THE WITNESS: Beg your pardon?

THE COURT: You may finish your answer.

THE WITNESS: Okay. To finish my answer, he asked me why I didn't go. I hadn't been in the habit of going with anyone else as a trainer. I would send Mr. Scott—if it was in the day, Mr. Carlton, or in the night it was Mr. Scott.

THE COURT: All right, Mr. Dinkelspiel.

## REDIRECT EXAMINATION

### BY MR. DINKELSPIEL:

Q. That's my question. That wasn't your job? You were the supervisor, weren't you?

A. Right.

Q. You didn't go out and show people routes?

A. That's right.

Q. You didn't show them where to go and what to do and it wasn't your job, and you didn't have the time to take every new employee and individually teach that person his or her particular job, did you?

A. No, I didn't.

Q. And it wasn't a matter, was it, of taking this lady out one night and saying okay, here is where you drive and pick this stuff up, and that is the end of it? This job took some training, did it not, Mr. Johnson?

A. It did.

Q. It wasn't something you did just in one night?

A. Right.

MR. DINKELSPIEL: That is all.

THE COURT: Anything further?

MR. KIRKPATRICK: No, sir.

THE COURT: You may step down, please.

(Witness excused.)